## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>-v.-<br><br>BNP PARIBAS, S.A.<br><br>Defendant. | No. 1:17-cv-5278-LGS |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>-v.-<br><br>CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; and CREDIT SUISSE SECURITIES (USA), LLC,<br><br>Defendants. | No. 1:17-cv-5282-LGS |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>-v.-<br><br>ROYAL BANK OF SCOTLAND GROUP PLC and RBS SECURITIES, INC.,<br><br>Defendants. | No. 1:17-cv-5284-LGS |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR FOR DISMISSAL FOR *FORUM NON CONVENIENS*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................ 3

    A.     NFA Membership ........................................................................................ 3

    B.     Alpari's FX Business .................................................................................. 5

    C.     Pricing and Liquidity Agreements and Platform Agreements Between Alpari
         and Defendants........................................................................................... 7

    D.     The Prime Brokerage Agreements .............................................................. 9

III.   ARGUMENT ...................................................................................................... 10

    A.     Standard of Review................................................................................... 10

    B.     Alpari Is Not Required to Engage in Mandatory Arbitration ................... 12

         1.     The NFA Member Arbitration Program Is Inapplicable Because
              None of the Actions Is Solely Among NFA Members ............................ 12

         2.     Alpari Did Not Agree to Arbitrate Claims Arising from Its
              B-Book Business ...................................................................................... 14

         3.     Alpari's Assertion of Claims with Respect to Which It Has
              Suffered Damages Is Not "Artful Pleading"........................................... 18

    C.     Alpari's Claims Should Not Be Dismissed for *Forum Non Conveniens*
         Because Defendants Cannot Invoke the Forum Selection Clauses as to Alpari ......... 20

         1.     The Alpari-BNP Pricing and Liquidity Agreement Relates
              to Transactions Not at Issue in This Action............................................. 22

         2.     The Prime Brokerage Agreements Do Not Cover the Parties
              or the Claims at Issue .............................................................................. 23

              a.     The Prime Brokerage Agreements Do Not Cover the
                    Claims at Issue ............................................................................ 23

               b.     The Prime Brokerage Agreements Do Not Cover the Parties ...... 26

IV.    CONCLUSION.................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguas Lenders Recovery Group v. Suez, S.A.*,
    585 F.3d 696 (2d Cir. 2009).................................................................................28, 29

*Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*,
    784 F. Supp. 2d 296 (S.D.N.Y. 2011)..................................................................26

*Applied Energetics., Inc. v. NewOak Capital Markets, LLC.*,
    645 F.3d 522 (2d Cir. 2011).................................................................................11

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986).......................................................................................11, 14

*Cargill, Inc. v. Charles Kowsky Res., Inc.*,
    949 F.2d 51 (2d Cir. 1991)...................................................................................21

*Contrast E.E.O.C. v. Waffle House, Inc.*,
    534 U.S. 279 (2002)..............................................................................................26

*Coudert v. Paine Webber Jackson & Curtis*
    705 F.2d 78 (2d Cir. 1983)...................................................................................18

*Cuno Inc. v. Hayward Indus. Prods. Inc.*,
    No. 03-cv-03076 (MBM), 2005 WL 1123877 (S.D.N.Y. May 10, 2005).........28, 29

*Denney v. Jenkins & Gilchrist*
    340 F. Supp. 2d 348 (S.D.N.Y. 2004)..................................................................17

*Dreyfuss v. eTelecare Global Solutions-US, Inc.*,
    No. 08 CIV. 1115 (RJS), 2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008), *aff'd*
    *sub nom. Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551
    (2d Cir. 2009)........................................................................................................11

*F5 Capital v. RBS Securities, Inc.*,
    No. 3:14-cv-1469 (VLB), 2015 WL 5797019 (D. Conn. Sept. 30, 2015).............21, 27, 28, 29

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..............................................................................................11

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*,
    764 F.3d 210 (2d Cir. 2014).................................................................................11

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    561 U.S. 287 (2010)...........................................................................................14

*In re Currency Conversion Fee Antitrust Litig.,*
    265 F. Supp. 2d 385 (S.D.N.Y. 2003).............................................................18

*In re Libor-Based Financial Instruments Antitrust Litigation,*
    No. 11 MDL 2262 NRB, 2015 WL 4634541 (S.D.N.Y.).................................25

*Iragorri v. United Techs Corp.,*
    274 F.3d 65 (2d Cir. 2001)..............................................................................20

*JLM Industries, Inc. v. Stolt-Nielson SA,*
    387 F.3d 163 (2d Cir. 2004).............................................................................18

*Lewis v. New Jersey Sports Prods., Inc.*
    2003 WL 1090279 (S.D.N.Y. Mar. 12, 2003) ..................................................17

*Longo v. Flight Safety Int'l,*
    1 F. Supp. 3d 63, 67 (E.D.N.Y. 2004) .........................................................21, 23

*Magi XXI Inc. v. Stato della Citta del Vaticano,*
    714 F.3d 714 (2d Cir. 2013)...........................................................................28, 30

*Malmsteen v. Universal Music Group Inc.,*
    No. 10 Civ. 3955(PAE), 2012 WL 2159281 (S.D.N.Y. June 14, 2012)...........22, 28

*Martinez v. Bloomberg LP,*
    740 F.3d 211 (2d Cir. 2014).............................................................................21

*McCowan v. Sears, Roebuck and Co.,*
    908 F.2d 1099 (2d Cir. 1990)...........................................................................20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985).........................................................................................24

*Mosca v. Doctors Assocs., Inc.,*
    852 F. Supp. 152 (E.D.N.Y. 1993) ..................................................................20

*New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,*
    121 F.3d 24 (2d Cir. 1997)...............................................................................23

*Nicosia v. Amazon.com, Inc.,*
    834 F.3d 220 (2d Cir. 2016).............................................................................11

*Norcom Elecs. Corp. v. CIM USA Inc,*
    104 F. Supp. 2d 198 (S.D.N.Y. 2000)..............................................................18

*NV Petrus SA v. LPG Trading Corp.*,
   14-CV-3138, 2017 WL 1831096 (E.D.N.Y. May 4, 2017) ...................................................21

*Oei Hong Long v. Goldman Sachs Group, Inc.*,
   No. 13-CV-8655 (JMF), 2014 WL 2893310 (S.D.N.Y. June 25, 2014) ...............................27

*Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*,
   28 F.3d 600 (7th Cir. 1994) ...............................................................................................25

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007)...............................................................................21, 24, 25, 26

*Prime Broker Committee Request, SEC No-Action Letter*,
   1994 WL 808441 (Jan. 25, 1994) .......................................................................................29

*SFM Holdings, Ltd. v. Banc of America Securities, LLC*,
   600 F.3d 1334 (11th Cir. 2010) ..........................................................................................29

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002)............................................................................................10, 11

*Suffolk Cnty. v. Long Island Lighting Co.*,
   728 F.2d 53 (2d Cir. 1984)..................................................................................................26

*Tellium, Inc. v. Corning Inc.*,
   No. 03 Civ. 8487(NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ................................11

*Triad Petroleum, Inc. v. Intercarbon Bermuda, Ltd.*,
   No. 83 Civ. 6190 (RWS), 1984 WL 766 (S.D.N.Y. Aug. 16, 1984)......................................18

*Walpert v. Jaffrey*,
   127 F. Supp. 3d 105 (S.D.N.Y. 2015)..................................................................................26

## I.      INTRODUCTION

Alpari (US) LLC ("Alpari") challenges Defendants' "Last Look" practices, that allowed them to renege on valid prices matched to their customers' orders.  Two of the Defendants, BNP Paribas, S.A. and Credit Suisse AG, have entered into consent orders with the New York State Department of Financial Services and paid fines of $350 million and $135 million, respectively, for conduct relating in part to their Last Look practices.[1]  Those fines provide no monetary relief to victims, and thus, Alpari's action seeks compensation for the victims of Defendants' Last Look practices.  Rather than litigate where their conduct was investigated and penalized and where their customers are located and were "last looked," Defendants attempt to send this action to either arbitration or England.

Defendants make three primary arguments in their Memorandum of Law in Support of Defendants' Motion to Compel Arbitration or, in the Alternative, to Dismiss the Amended Complaints on Grounds of *Forum Non Conveniens* (hereinafter, "Defendants' Memo"): (1) that because Plaintiff Alpari was a National Futures Association ("NFA") Member throughout the Class Period, and Defendants were (a) NFA Members during part of the January 1, 2008-May 23, 2017 Class Period; or (b) merely associated with NFA Members during parts of the Class Period, all of Alpari's claims during the entire Class Period are subject to mandatory arbitration under NFA Member Arbitration Rules; (2) that certain contracts regarding separate and distinct business relationships between Alpari and Defendants expressly not at issue in this litigation compel arbitration of Alpari's claims; and (3) that the suit should be dismissed on *forum non*

---

[1]      *See*    http://www.dfs.ny.gov/about/ea/ea170524.pdf    (BNP);    http://www.dfs.ny.gov/about/ea/ea171113.pdf (Credit Suisse): all website citations were last visited Jan. 10, 2018.

*conveniens* grounds based, in large part, on contracts to which Alpari and the Defendants are not in privity, and that do not cover the claims involved in this case. Each argument lacks merit.

First, mandatory NFA Member arbitration is reserved ***solely*** for disputes between and among NFA Members or those who were NFA Members "at the time the acts or transactions that are the subject of the dispute occurred,"[2] while claims between an NFA Member and an "Associate" of a Member are only subject to mandatory NFA arbitration "at the election of the person filing the claim." Defendants Credit Suisse Group AG, Credit Suisse AG (together "Credit Suisse"), and The Royal Bank of Scotland Group plc ("RBS"), concede they are not NFA Members, but rather principals (and thus, per NFA rules, "Associates"), and thus they lack unilateral authority to compel arbitration of Alpari's claims under NFA's rules. As for Defendant BNP Paribas (which became an NFA Member on May 7, 2013), it could only seek, at most, to compel NFA Member arbitration for Alpari transactions arising after their overlapping respective dates of NFA membership. None of the transactions during the Class Period preceding commencement of their respective NFA memberships could plausibly be compelled to NFA arbitration.

Second, Defendants ignore the substance of Plaintiff's claims by contending that arbitration and forum selection clauses found in Pricing and Liquidity Agreements they entered into with Alpari are applicable and can be used to mandate arbitration and/or forum selection. The Pricing and Liquidity Agreements expressly concern the Defendants' provision of liquidity to QuantumFX, an electronic communications network ("ECN") for Alpari's institutional clients

---

[2]     NFA Member Arbitration Rules §§1(j), 2(a), https://www.nfa.futures.org/rulebook/rules.aspx?Section=6.

(the so-called "A-Book business"), in which Defendants streamed prices to Alpari's A-Book clients and Alpari did not undertake any trading risk.

But, as the complaints expressly note, the claims in this case involve Defendants' improper conduct in a wholly distinct and separate line of business by which Alpari traded directly against retail clients and then entered into hedging transactions on its own behalf with Defendants on third-party ECNs such as Currenex (the so-called "B-Book business"). Because a party can only be required to arbitrate a dispute when it contractually agreed to do so, and because the Pricing and Liquidity Agreements apply solely to one distinct line of Alpari's business that has no applicability or relevance to the B-Book business claims being asserted, those unrelated agreements do not compel arbitration. Defendants can point to no agreement requiring arbitration of Alpari's B-Book business because Alpari never entered into any agreement that mandated arbitration of its B-Book claims with Defendants.

Third, for a court to dismiss on a *forum non conveniens* motion pointing to a forum selection clause, the party seeking to invoke the clause must create a presumption of enforceability by demonstrating that forum selection clauses cover the parties *and* claims at issue. Here, however, Defendants have failed to create this presumption because the forum selection clauses they point to cover *neither* the parties nor the claims at issue.

Because Defendants' arguments lack merit, the Court should deny their motion.

## II. FACTUAL BACKGROUND

### A. NFA Membership

The NFA is a self-regulated organization with authority from the Commodity Futures Trading Commission ("CFTC") to oversee and regulate the integrity of the derivatives market, including overseeing "forex dealer members." These are entities who "act, or offer[ ] to act, as a

counterparty to an off-exchange foreign currency transaction."[3]  Pursuant to the Commodity Exchange Act and CFTC regulations, certain firms and individuals that conduct business in the derivatives industry, such as Alpari and Defendants, are required to register with NFA and become NFA Members.[4]  Relevant to this case, entities that are "the direct owner of 10% or more of the outstanding shares" of any NFA Member's equity securities must register via NFA Form 8-R as a "principal" of the NFA Member.[5]  NFA Member principals are considered "associated persons" or an "Associate" under NFA rules.[6]  The NFA maintains a searchable electronic database of its Members, and their principals/associated persons.[7]

Under the NFA Member Arbitration Rules, "disputes between and among Members shall be arbitrated under" NFA Member Arbitration Rules, subject to certain exceptions.  First, the Member must have been a "Member at the time the acts or transactions that are the subject of the dispute occurred."[8]  Second, the NFA has made clear that arbitration is compelled only for "[d]isputes *solely* between Members." (emphasis added).[9]  Where the dispute does not involve

---

[3]     *Who We Are*, NFA, https://www.nfa.futures.org/about/index.html; *Forex Dealer Members*, NFA, https://www.nfa.futures.org/members/fdm/index.html.

[4]     *What We Do*, NFA, https://www.nfa.futures.org/about/index.html.

[5]     NFA Registration Rules §§101(k), (t), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8; NFA Bylaw §301(j), https://www.nfa.futures.org/rulebook/rules.aspx?Section=3.

[6]     NFA Registration Rules §101(d), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8; NFA Member Arbitration Rules §§1(d), 2(b), https://www.nfa.futures.org/rulebook/rules.aspx?Section=6.

[7]     Background Affiliation Status Information Center (BASIC), NFA, https://www.nfa.futures.org/basicnet/.

[8]     NFA Member Arbitration Rules §§1(j), 2(a), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8.

[9]     Notice I-99-11: Expansion of NFA's Member Arbitration Program ("NFA Notice"), NFA, https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=183.

solely NFA Members but rather NFA Associates, the dispute shall be arbitrated "***at the election of the person filing the claim***," subject to limited exceptions.[10]

Pursuant to NFA rules, Plaintiff Alpari (US), LLC ("Alpari") was a registered Member of the NFA from November 14, 2007 to April 21, 2015.[11]  Defendants Credit Suisse Securities (USA) LLC, and RBS Securities, Inc. were likewise NFA Members at all relevant times to this litigation.[12]  Defendant BNP Paribas became an NFA Member on May 7, 2013.[13]  Defendants Credit Suisse Group AG and Credit Suisse AG are listed by the NFA only as "principals" of Credit Suisse International (which became an NFA Member on May 3, 2013),[14] while Defendant The Royal Bank of Scotland Group plc is similarly listed only as a "principal" of Royal Bank of Scotland plc.[15]

### B.  Alpari's FX Business

Alpari was an FX broker-dealer that operated two different businesses during the relevant time period.  Am. Compl., ¶10,[16] Harmon Decl., ¶3.  No later than 2010, and through at least

---

[10]   NFA Member Arbitration Rule §2(b) (emphasis added), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8.

[11]   Basic Details: Alpari US LLC, NFA, https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=ISBX1mhBYJ0%3d.

[12]   Basic Details: Credit Suisse Securities USA LLC, NFA, https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=Qlx94%2bf0B1Y%3d;  Basic Details: RBS Securities Inc, NFA, https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=bC8S0%2B6BJSk%3D.

[13]   Basic Details, BNP Paribas, S.A. NFA, https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=VqDjQ5X9nvA%3d.

[14]   BASIC Details: Credit Suisse International, NFA, https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=AtpoztHSeX4%3d&rn=Y.

[15]   BASIC Details: The Royal Bank of Scotland Group PLC, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Qlx94%2bf0B1Y%3d&rn=N.

[16]   Citations to "Am. Compl." are to the First Amended Class Action Complaint in the Credit Suisse action and are meant as representative allegations for each of the three actions.  To the extent Alpari cites specifically to the amended complaints in either the BNP Paribas action or the RBS action, it will make such citation(s) clear.

2013, Alpari operated a "B-book" business that allowed its *retail* (a.k.a. non-institutional) clients to conduct FX trading.  Am. Compl., ¶12; Harmon Decl., ¶4.[17]  Alpari operated three ECN platforms for its B-Book business: MetaTrader 4, Alpari Direct Pro, and a branded version of Dukascopy.  *Id*.  Notably, Alpari does not allege that any Defendant (or other Liquidity Provider) ever streamed FX prices into Alpari's B-Book business platforms.

In operating Alpari's B-Book business, Alpari traded against its B-Book clients.  It kept its retail clients' orders in-house, effectively acting as a liquidity provider.  *See* Harmon Decl., ¶4. It then executed its own independent FX transactions with different liquidity providers, including Defendants, in order to hedge its overall risk position.  Am. Compl., ¶12.  These trades between Alpari and Defendants were on Alpari's own behalf and were independent of Alpari's trades with its B-Book clients.  *Id*. ¶12.  "Because these trades with Liquidity Providers were on its own behalf and independent of Alpari's traders with its retail clients, they [Alpari's trades] occurred at different times than trades entered into by Alpari's retail clients, and they often involved different currency pairs."  *Id*.

All the trades Alpari executed to hedge its B-Book risks were executed through third-party ECNs, including Currenex.  Am. Compl., ¶14.  While Alpari had a contract to trade through Currenex, the Currenex contract did not govern the specific matching and execution of transactions between Alpari and each Defendant.  *Id*.  Indeed, no written agreement between Alpari and Defendants governed the matching and execution of Alpari's B-Book hedging transactions.  *Id*.

---

[17]     Declaration of Jermaine C. Harmon in Support of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration or, in the Alternative, to Dismiss the Amended Complaints on Grounds of *Forum Non Conveniens* attached hereto as Exhibit 1 ("Harmon Decl.").

From 2011-2015, Alpari separately operated an "A-Book" business for its ***institutional*** clients. Am. Compl., ¶11; Harmon Decl., ¶5. For its A-Book business, Alpari operated a trading platform (QuantumFX). *Id.* For the sole purpose of facilitating its A-Book business, Alpari contracted with liquidity providers, such as Defendants, to stream executable pricing into QuantumFX for trading by Alpari's institutional clients. Am. Compl., ¶11; Harmon Decl., ¶6. These price-streaming agreements are specific to, and exclusively address, Alpari's A-Book business. *Id.*

Unlike its B-Book business, Alpari did not hold funds or bear risks for its "A-Book" clients. Am. Compl., ¶11; Harmon Decl., ¶5. For its "A-Book" business, Alpari acted as an intermediary or broker. *Id.* When an Alpari institutional client entered into a trade on QuantumFX, Alpari would simultaneously enter into an offsetting transaction in its own name directly with a liquidity provider for the exact same currency pair and volume. *Id.* Alpari would charge a pre-determined markup to the institutional client for making the offsetting transaction. Harmon Decl., ¶5. This markup applied regardless of the price transacted by Alpari's institutional client. *See id.*

### C. Pricing and Liquidity Agreements and Platform Agreements Between Alpari and Defendants

In 2011, for purposes of building its A-Book business, Alpari entered into separate agreements ("Pricing and Liquidity Agreements") with Credit Suisse, RBS, and BNP Paribas. These agreements concerned solely Defendants' role as liquidity providers streaming executable pricing to Alpari's QuantumFX trading platform offered for its institutional clients, and as such, were specific to Alpari's A-Book business. Am. Compl., ¶11; Harmon Decl., ¶6. The Agreements do not make any reference to, or otherwise apply to, Alpari's B-Book business.

In contrast, the Pricing and Liquidity Agreements relied on by Defendants contain terms demonstrating that they are expressly limited to Alpari's A-Book business. Specifically, all these agreements contain a nearly identical introductory statement: "Alpari desires to enter into this Agreement pursuant to which one or more liquidity providers, including Liquidity Provider [Defendant], shall stream executable pricing into the Trading Platform pursuant to the terms and conditions set forth herein." *See* Cohen Decl. (ECF No. 43), Ex. 1; Januszewski Decl. (ECF No. 42), Ex. 1; Hall Decl. (ECF No. 41), Ex. 1. The Agreements then define "Trading Platform" as "the trading platform offered by Alpari from time to time for use by ***Institutional Clients***." *Id.* (emphasis added).

The BNP Paribas Pricing and Liquidity Agreement further mapped out Alpari's "A-Book" business and provided that:

> "Alpari supports certain trade execution activities, whereby Alpari clients ("Client") may enter into Transactions, including FX transactions . . ., with Alpari using the services and facilities of Alpari (each such Transaction, a "Client Transaction") and on the basis of Liquidity Provider's executable pricing . . . and Alpari will simultaneously enter into a back-to-back Transaction with Liquidity Provider which is identical to the Transaction executed as between Alpari and its Client, but with Alpari standing in the place of the Client, and Liquidity Provider standing in the place of Alpari . . . ." (BNP Paribas Pricing and Liquidity Agreement.)

Hall Decl., Ex. 1. The BNP Paribas Pricing and Liquidity Agreement further notes that its quotes and streaming prices are only to be provided to the Trading Platform for Alpari's Clients, *i.e.*, its institutional clients trading on the QuantumFX platform.

While the agreements cited by Credit Suisse and RBS contained arbitration clauses and the agreement cited by BNP Paribas contains an English forum selection clause, nothing in these agreements governed Alpari's B-Book business – the business that forms the basis of Alpari's claims. Additionally, Alpari's risk-hedging transactions undertaken as part of its B-Book business, which are the subject of this action, pre-date the existence of the Pricing and Liquidity

Agreements with Defendants.  Alpari held funds for clients and executed its own independent FX transactions with liquidity providers to manage Alpari's risk position – as part of its B-Book business – no later than 2010, and through at least 2013; whereas, the Pricing and Liquidity Agreements were executed in 2011.  Am. Comp., ¶11; Harmon Decl., ¶6.[18]  This further demonstrates the distinctive nature of Alpari's two businesses.

### D.     The Prime Brokerage Agreements

In 2010, Alpari entered into a Customer FX Prime Brokerage Agreement ("Prime Brokerage Agreement") and an ISDA Master agreement with Morgan Stanley ("Alpari-MS ISDA").  No Defendant was a party to these agreements, nor did these agreements govern the specific matching and execution of transactions between Alpari and each Defendant.  *See* Am. Compl., ¶14.  Moreover, the Alpari-MS ISDA expressly specified that "a person who is not party to this agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement."  *See* Januszewski Decl., Ex. 2 at Schedule, Part 4 (h)(b)(ii).  The Prime Brokerage Agreement sets forth the mechanism by which Alpari can "give up" trades that it executed with Liquidity Providers to Morgan Stanley.  But there are no provisions in the Prime Brokerage Agreement governing the execution and matching of trades between Alpari and a Liquidity Provider prior to the time that there is an executed trade to be given up.

Defendants claim that they entered into separate bilateral Master FX Give-Up agreements with Morgan Stanley that established Alpari as a designated party through "FX Give-Up Notices."  *See* Defendants' Memo at 8.  Alpari was not a party to any of these Master FX Give-Up agreements between Morgan Stanley and Defendants, and there is no indication that the

---

[18]     The Pricing and Liquidity Agreement between The Royal Bank of Scotland Plc and Alpari (US LLC was executed on April 4, 2011; between Credit Suisse AG and Alpari (US) LLC on January 25, 2011 (although the exhibit provided by Defendants is not signed by Alpari); and between BNP Paribas and Alpari (US) LLC on May 24, 2011.  Cohen Decl., Ex. 1; Januszewski Decl., Ex. 1; Hall Decl., Ex. 1.

agreements were ever sent to Alpari.  In addition, the "FX Give-Up Notices" do not reference any forum selection clause.[19]

In contrast, Alpari had separate side agreements with RBS and BNP Paribas setting out a procedure for unwinding transactions that were rejected by the prime broker.  *See id*.  These agreements contain clauses that expressly designate "the courts of the State of New York" and "the United States District Court located in the Borough of Manhattan in New York City" to have non-exclusive jurisdiction over any proceeding relating to these side agreements, and further provide that New York law will govern any such proceeding.[20]

## III.   ARGUMENT

### A.   Standard of Review

Whether a dispute is subject to arbitration rests on two inquiries: (1) whether there exists a valid agreement to arbitrate at all under the contract in question; and if so (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26-27 (2d Cir. 2002).  The Court should consider the scope of the arbitration clause only after a court has found the parties entered into a valid agreement to arbitrate.  And in analyzing whether a particular claim falls within the scope of an arbitration agreement, the Court's inquiry "focus[es] on the factual allegations in the

---

[19]     *See* FX Give-Up Notice between RBS and Morgan Stanley, dated May 14, 2012, subsequently amended on February 27, 2013 ("RBS Give-Up Notice"); FX Give-Up Notice between Credit Suisse and Morgan Stanley, dated June 14, 2010 and subsequently amended on July 19, 2010, October 14, 2010, January 20, 2011, July 7, 2011, October 17, 2011, and October 19, 2011 ("Credit Suisse Give-Up Notice); FX Give-Up Agreement Notice between BNPP and Morgan Stanley, dated July 19, 2010 and subsequently amended on September 28, 2010, January 20, 2011, May 4, 2011, May 24, 2010, July 7, 2011, August 18, 2011, October 19, 2011, March 14, 2012, May 11, 2012, August 28, 2012, and November 21, 2012 ("BNPP Give-Up Notice").

[20]     *See* Side Letter between RBS and Alpari, dated May 16, 2012 ("RBS Side Letter"); Agreement for the Treatment of Rejected Give-Up Transactions between BNP Paribas and Alpari, dated July 21, 2010.

complaint rather than the legal causes of action asserted." *Id.* at 36.  Resolution of these questions is a matter of state contract law – here, New York.  *Id.*

Because arbitration is a matter of contract, a court cannot force parties to arbitrate a dispute unless the parties have entered into a valid agreement to do so.  *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).[21]  The Supreme Court has emphasized that arbitration "is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  Therefore, despite any federal policy favoring arbitration, a court may only order parties to arbitrate where it has been shown that they entered into a valid agreement to arbitrate the particular dispute at issue.  *See Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) ("the presumption" in favor of arbitration "does not apply to disputes concerning whether an agreement to arbitrate has been made"); *Applied Energetics., Inc. v. NewOak Capital Markets, LLC.*, 645 F.3d 522, 526 (2d Cir. 2011).

In analyzing a motion to compel arbitration, courts must draw all reasonable inferences in favor of the Plaintiff as the non-moving party.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).  Defendants, as the moving parties, bear "the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate."  *Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08 CIV. 1115 (RJS), 2008 WL 4974864, at *3 (S.D.N.Y. Nov. 19, 2008), *aff'd sub nom.  Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009); *see also Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487(NRB), 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004).

---

[21]     Unless otherwise noted, all emphasis is added and citations are omitted.

**B.     Alpari Is Not Required to Engage in Mandatory Arbitration**

**1.     The NFA Member Arbitration Program Is Inapplicable Because None of the Actions Is Solely Among NFA Members**

In adopting mandatory Member arbitration, the NFA made clear that mandatory NFA Member Arbitration only applies to disputes *solely* "between and among NFA Members."  *See* NFA Notice ("Disputes *solely* between Members will be subject to fully mandatory arbitration, which means Members will be required to file their claims at NFA.").[22]  While certain Defendants claim to be "principals" of NFA Members, this status is insufficient to invoke mandatory NFA Member Arbitration.  As the NFA Member Arbitration Rules make explicit, all parties must be NFA *Members* to compel mandatory arbitration.[23]  By contrast, under NFA Member Arbitration Rule 2(b), when a dispute is between an NFA Member and "Associates" of an NFA Member (which principals of NFA Members are considered), "disputes between Members and Associates and between Associates shall be arbitrated under these Rules, *at the election of the person filing the claims* [subject to limited exceptions]."  In this case, the power to compel mandatory NFA arbitration lies not with Defendants (like Credit Suisse AG, Credit Suisse Group AG, and The Royal Bank of Scotland Group plc) who are merely principals/Associates of NFA Members, but rather, Plaintiff Alpari, who is "the person filing the claim."

---

[22]     Prior to the adoption of mandatory Member Arbitration, the NFA allowed the person bringing the claim to choose whether or not to arbitrate, making "NFA arbitration mandatory for the person the claim is against but not the party filing it."  NFA Notice.

[23]     "[A] Member of NFA other than a contract market or a person that was a Member (other than a contract market) at the time the acts or transactions that are the subject of the dispute occurred."  NFA Member Arbitration Rules §§1(j), 2(a), website *supra* n.7.

Documents from the NFA[24] demonstrate that, when it comes to NFA membership, a "principal" is not synonymous with a "Member."  An NFA Member is an entity that is listed within NFA's registration system (BASIC) as an "NFA Member Approved."  That status has, at any time, applied to only four named parties to the Actions: Alpari,[25] BNP Paribas (after May 7, 2013),[26] Credit Suisse Securities (USA) LLC,[27] and RBS Securities, Inc.[28]  Defendants Credit Suisse Group AG, Credit Suisse AG, and Royal Bank of Scotland Group Plc are not NFA Members and have never been NFA Members.[29]  Because both the Credit Suisse and RBS Actions involve non-NFA Members at all relevant times, they fall entirely outside NFA's Member Arbitration Rules.  The limited scope of these rules is made evident by the fact that none of the parties to any of the Actions is identified in BASIC as ever having been involved in any NFA Arbitration decision as claimant or respondent.[30]

Likewise, Alpari's action against BNP Paribas is not solely between Members.  The NFA's Member definition provides that a "Member" is someone who either is a Member or "was

---

[24]    A complete list of NFA members is available for download at: https://www.nfa.futures.org/NFA-registration/NFA-directory/nfa_reg_memb.csv.

[25]    BASIC Details: Alpari US LLC, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=ISBX1mhBYJ0%3d&rn=Y.

[26]    BASIC Details: BNP Paribas S.A., NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=VqDjQ5X9nvA%3d&rn=Y.

[27]    BASIC Details: Credit Suisse Securities USA LLC, NFA, https://www.nfa.future.org/basicnet/Details.aspx?entityid=oMwvJtkNrTM%3d&rn=Y.

[28]    BASIC Details: Credit Suisse Securities USA LLC, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=oMwvJtkNrTM%3d&rn=Y.

[29]    BASIC Details: Credit Suisse Group AG https://www.nfa.futures.org/basicnet/Details.aspx?entityid=ijr9j7zzNm4%3d&rn=N; BASIC Details: Credit Suisse AG https://www.nfa.futures.org/basicnet/Details.aspx? entityid=q3isN%2b989hg%3d&rn=N; BASIC Details: The Royal Bank of Scotland Group PLC, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Qlx94%2bf0B1Y%3d&rn=N; BASIC Details: RBS Securities Inc., NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=bC8S0%2b6BJSk %3d&rn=Y.

[30]    *See* BASIC Registrations, *supra* n.26-30.

a Member . . . at the time the acts of transactions that are the subject of the dispute occurred."
NFA Member Arbitration Rules §§1(j), 2(a).  As alleged in the Amended Complaint, this dispute
began in 2008, at a time that BNP Paribas was not a Member; moreover, it has continued after
Alpari ceased to be a Member.  The vast majority of time represented by the class period falls
outside the brief period where disputes between Alpari and BNP Paribas could have been subject
to this arbitration provision.  As such, under the NFA's Member definition, the Alpari-BNP
Paribas dispute is also not a dispute solely between Members, because with respect to the dispute
in the Action, BNP Paribas was a non-Member for most of the relevant Class Period.

### 2.     Alpari Did Not Agree to Arbitrate Claims Arising from Its B-Book Business

The Court cannot force Alpari to arbitrate its disputes with Defendants without first
determining that Alpari has entered into valid agreements to do so.  *See AT & T Techs.*, 475 U.S.
at 648; s*ee also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts
should order arbitration of a dispute only where the court is satisfied that neither the formation of
the parties' arbitration agreement nor (absent a valid provision specifically committing such
disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.").  Here,
there is no basis for such a determination.

Alpari's claims against Defendants concern only its B-Book business, which is the only
business in which it bore trading risk on account of trades made with the Defendants.  Thus, as
the moving parties, Defendants bear the burden to demonstrate that a valid arbitration agreement
covers the disputes concerning Alpari's B-Book business.  But Defendants have not, and cannot,
point to any arbitration clause that covers Alpari's claims in its Amended Complaint.
Recognizing that no arbitration agreements cover Alpari's B-Book retail business, Defendants
instead attempt to stretch contracts that apply only to Alpari's A-Book institutional business

beyond meaning.  But as detailed below, governing case law expressly holds that even when the same parties have multiple business relationships, one cannot be forced to arbitrate an issue when it did not agree to do so.

The amended complaints specifically allege that Alpari conducted two separate lines of business: (1) a B-Book business with retail clients; and (2) an A-Book Business with institutional clients.  Am. Compl., ¶¶11-12.  In its A-Book business, liquidity providers such as Defendants streamed prices on Alpari's trading platform, QuantumFX; Alpari's institutional clients entered into trades on QuantumFX, and Alpari entered into offsetting trades.  Am. Compl., ¶11; Harmon Decl., ¶5.  In its separate B-Book business (again, the subject of the claims), Alpari traded directly against its retail clients and then entered into, on its own behalf, hedging transactions with liquidity providers, such as Defendants, on ECNs such as Currenex.  Am. Compl., ¶12; Harmon Decl., ¶4.  Liquidity providers, therefore, did not stream prices on Alpari's Platform, QuantumFX, as part of Alpari's B-Book Business.

Alpari expressly limits its claims to trades it made on its own behalf as part of its B-Book business.  Am. Compl., ¶13.  Alpari specifically alleges it did not enter into a written agreement with any Defendant that governs, or even relates to, the terms and conditions they claim were breached concerning the subsequent execution of a transaction – much less any such contract that contains an arbitration clause.  *See* Am. Compl., ¶14 ("No written agreement between Alpari and [Defendants] governed the matching and execution of transactions made by Alpari through Currenex with [Defendants].").

Defendants Credit Suisse and RBS argue the Pricing and Liquidity Agreements between themselves and Alpari contain arbitration clauses that cover Alpari's B-Book claims.  These Agreements, however, concern **only** Alpari's A-Book Business, and do not relate to Alpari's B-

Book business.  Plaintiff never agreed to arbitrate claims arising from that business.  The plain language of the Agreements show they only apply to Alpari's A-Book business.   The Agreements obligated Defendants Credit Suisse AG and The Royal Bank of Scotland plc, each as a "Liquidity Provider," to "stream executable pricing into [Alpari's] Trading Platform pursuant to the terms and conditions set forth herein."   *See* Januszewski Decl., Ex. 1; Cohen Decl., Ex. 1; Defendants' Memo at 12-15.  The Agreements define "Trading Platform" as "the trading platform offered by Alpari from time to time for use by ***Institutional Clients***." Januszewski Decl., Ex. 1; Cohen Decl., Ex. 1.  The Trading Platform at issue in the Pricing and Liquidity Agreements is the QuantumFX platform used solely by Alpari's A-book institutional clients.  Am. Compl., ¶11; Harmon Decl., ¶6.  These Agreements do not obligate Defendants to stream prices to Alpari's B-Book business, nor have Defendants ever, pursuant to the Agreements, streamed prices as liquidity providers into Alpari's B-Book business; no provision in the Agreements involves Alpari's trades through Currenex on its own behalf.  Because Alpari never agreed to arbitrate its B-Book claims, Credit Suisse and RBS's reliance on Agreements that pertain only to Alpari's A-Book business to force arbitration of its B-Book business is unfounded.

In sum, Plaintiff never agreed to arbitrate claims arising from its B-Book business. Defendants have therefore failed to meet their burden to show a valid arbitration clause exists, particularly because there is no presumption of arbitration as to whether Plaintiff agreed to arbitrate these claims at all.  Therefore, it does not matter whether the Court finds the arbitration provision in the Agreements to be narrow or broad, *see* Defendants' Memo at 12-15, because under no interpretation do these Agreements concern Alpari's B-Book business.  Plaintiff does not assert the Pricing and Liquidity Agreements were breached in any manner.  None of these

provisions in any way relates to the manner in which RBS or Credit Suisse were contractually obligated to execute Alpari's risk-hedging trades for its B-Book business.  *See* RBS and Credit Suisse Am. Compls., ¶¶97-101; BNP Am. Compl., ¶¶99-103.

Courts in this District have repeatedly held that a defendant cannot force parties to arbitrate claims concerning one type of business relationship pursuant to a contract about a different business relationship.  In *Denney v. Jenkins & Gilchrist*, for example, the court assumed *arguendo* that the parties entered into a valid agreement to arbitrate and proceeded to examine the scope of the arbitration clause at issue.   340 F. Supp. 2d 348, 352-53 (S.D.N.Y. 2004).  Although the court determined it was broad, it also held that the dispute was not subject to arbitration "because plaintiffs' allegations *[did] not arise in connection with the performance or breach of the contracts*."  *Id.* (emphasis in original).  Critically, the *Denney* court held that agreements providing for consulting services as to the expansion, sale, or transfer of businesses did not relate to contract provisions providing advice concerning tax shelters, foreign investments, and accounting.  *Id.*  The court rejected defendants' attempt "to apply the arbitration clauses to a dispute that arises entirely outside the scope of the agreements," and denied their motion to compel arbitration.  *Id.*

Similarly, the court in *Lewis v. New Jersey Sports Prods., Inc.*, denied a motion to compel arbitration where the provision was not contained in the contract that governed the dispute at issue.  No. 02 CIV.6505 SAS, 2003 WL 1090279, at *3-4 (S.D.N.Y. Mar. 12, 2003).  The defendants in *Lewis* asserted two separate agreements related to the promotion of a single boxer's matches were both subject to an arbitration clause in only one of the contracts.  But the court rejected this argument, "because disputes under [the first agreement] can be resolved without any interpretation or consideration of the terms of the [second agreement]."  *Id.*; *see also*

*Triad Petroleum, Inc. v. Intercarbon Bermuda, Ltd.*, No. 83 Civ. 6190 (RWS), 1984 WL 766, at *2 (S.D.N.Y. Aug. 16, 1984) (denying petition to compel arbitration where dispute is not "inextricably tied up with the merits of" the disputes under the main agreement).

The cases cited by Defendants are distinguishable because they do not involve two separate contracts that govern separate distinct business relationships between parties.[31] *Coudert v. Paine Webber Jackson & Curtis*, cited by Defendants, actually supports Plaintiff's position. 705 F.2d 78, 82 (2d Cir. 1983); Defendants' Memo at 16. In *Coudert*, the court denied a motion to compel arbitration of a former employee's defamation lawsuit for statements "suggesting that she was discharged for cause rather than that she resigned"; despite a provision mandating "[a]ny controversy . . . arising out of the employment or termination of employment" go to arbitration. *Id.* at 80-82. The Court held that "the dispute itself does not pertain to employment or termination of employment; the tortious acts are all claimed to have occurred after such termination." *Id.* at 82. Here, too, the dispute does not arise from or relate to the A-Book agreement. Because the dispute at issue is outside the scope of the arbitration clause cited by Defendants, even if it were held to be valid and broad in scope, Defendants' motion to compel arbitration should be denied.

### 3. Alpari's Assertion of Claims with Respect to Which It Has Suffered Damages Is Not "Artful Pleading"

Defendants next assert that Alpari is attempting to evade arbitration agreements through "artful pleading," but that argument fares no better. Defendants again mischaracterize the nature

---

[31]     Rather, the cases are relevant to whether the language of a clause was narrow or broad – a determination which, as discussed above, is irrelevant to Defendants' Motion to Compel Arbitration clause in any contract they rely upon. *See* Defendants' Memo at 15-16 (citing *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 404-06 (S.D.N.Y. 2003); *Norcom Elecs. Corp. v. CIM USA Inc*, 104 F. Supp. 2d 198, 204 (S.D.N.Y. 2000); *JLM Industries, Inc. v. Stolt-Nielson SA*, 387 F.3d 163, 172 (2d Cir. 2004).

of Alpari's business and the Agreements they rely upon, and further cite to cases that are distinguishable to the facts alleged by Plaintiff.

Far from "artful pleading," Alpari has clear reasons to have not asserted claims related to its A-Book trades, which should come as no surprise to Defendants.  In its A-Book business, Alpari made a matching trade to offset the trade of an institutional client, charging a predetermined markup.  Harmon Decl., ¶5.  To the extent Defendants' Last Look practices caused the trade to be filled at a worse price than originally matched, Alpari would still apply its same markups to the new (worse) price.[32]  Because Alpari would not suffer damages in such a situation, it would have no reason to bring claims against Defendants based on Last Look practices being applied by Defendants to Alpari's A-Book business.

The Agreements with Defendants do not relate to Alpari's B-Book trades and, therefore, do not relate to Alpari's claims.  Defendants' contention that the Class definition "plainly includes [A-Book based] claims," despite Plaintiff alleging "it [Alpari] does not advance claims based on its A-Book business," is simply incorrect.  *See* Defendants' Memo at 17.  By the very terms of the class definition, these claims would be excluded.  The Complaints define the Class, in relevant part, as: "All persons . . . who, [during the Class Period], placed an order on a ***third party ECN*** that was matched to [Defendant's] streaming price and was either rejected by [Defendant] or filled at a price less favorable . . ."  *See* Credit Suisse and RBS Am. Compls., ¶89; BNP Am. Compl., ¶91.  QuantumFX, as Defendants acknowledge, was Alpari's trading platform – not a "third party ECN."  *See* Defendants' Memo at 5-6, 17.  By once again conflating

---

[32]     To the extent Defendants' Last Look practices caused a trade to be rejected in Alpari's A-Book business, the trade with Alpari's client would not consummate.  In contrast, the execution of trades between Alpari and its clients in its B-Book business were not dependent on any sort of executed trade between Alpari and a Liquidity Provider.

Alpari's A-Book business with its B-Book business, Defendants are merely repeating an argument that should be, as discussed above, rejected as unfounded.  Plaintiff is, as set forth above and in the Complaints, only asserting claims arising from its B-Book business; Defendants may not themselves "artfully replead" the Complaint to incorporate allegations it does not make.

Nor do the cases Defendants rely upon provide any support for their flawed argument that Plaintiff is attempting to plead around what should be mandatory arbitration clauses.  *See* Defendants' Memo at 16-17.  As discussed above, the claims asserted by the Plaintiff are simply unrelated to, and independent from, the Liquidity and Pricing Agreements and their narrow arbitration clauses.  It is of no significance that another district court outside of the Second Circuit found claims that were "inextricably intertwined" with the terms of an arbitrable agreement to be subject to arbitration.  Defendants' Memo at 16 (citing *Smith v. Smith*, No. 3:14-cv-0707-ST, 2014 WL 5462023, at *7 (D. Or. Oct. 27, 2014)).  Here, there is no indication, and it is not true, that Alpari's wholly separate businesses are somehow inextricably intertwined.

Furthermore, the cases of *Mosca v. Doctors Assocs., Inc.*, 852 F. Supp. 152, 155 (E.D.N.Y. 1993), and *McCowan v. Sears, Roebuck and Co.*, 908 F.2d 1099, 1106 (2d Cir. 1990), are distinguishable on their face.  The primary holding in these cases was that the plaintiffs had failed to name the proper party to the agreements at issue, but Defendants do not argue that. Defendants' Memo at 16.  Defendants' attempt at artfully repleading the complaint in terms most favorable to them must be rejected.

### C.   Alpari's Claims Should Not Be Dismissed for *Forum Non Conveniens* Because Defendants Cannot Invoke the Forum Selection Clauses as to Alpari

When considering a motion to dismiss on the basis of *forum non conveniens*, "[a] plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum."  *Iragorri v. United Techs Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).

Even in the presence of a valid forum selection clause, "because [a] plaintiff risks losing its chosen forum by enforcement of the forum-selection clause, the plaintiff is entitled to have the facts viewed in the light most favorable to it." *See Longo v. Flight Safety Int'l*, 1 F. Supp. 3d 63, 67 (E.D.N.Y. 2004).  To create a presumption of enforceability with respect to a forum selection clause, a defendant must demonstrate that both "the ***claims and parties*** involved in the suit are subject to the forum selection clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014); *see also id.* (If the forum selection clause was [1] communicated to the resisting party, [2] has mandatory force, and [3] covers the claims and parties involved in the dispute, it is presumptively enforceable.).[33]

Here, Defendants have failed to meet this burden to create a presumption of enforceability.  Defendants rely upon forum selection and choice-of-law clauses (designating the courts of England as the proper forum and law) found in, respectively, (1) the Alpari-BNP Pricing and Liquidity Agreement; (2) the "prime brokerage agreements," constituting an ISDA agreement between Alpari and ***Morgan Stanley*** (not Defendants), which expressly prevents third parties from gaining rights under the agreement; (3) Master FX Give-Up agreements between ***Morgan Stanley*** (not Alpari) and Defendants; and (4) ISDA agreements between ***Morgan***

---

[33]      Where an agreement also contains a choice-of-law clause, questions relating to the interpretation of the contract are properly resolved according to the law chosen by the parties. *Martinez*, 740 F.3d at 217-18.   "The Second Circuit has determined that steps two and three are governed by the law contractually selected by the parties, while step four is governed by federal law.  Although this is the general rule, a court need not apply foreign law to interpret a forum selection clause unless the parties do so." *F5 Capital v. RBS Securities, Inc.*, No. 3:14-cv-1469 (VLB), 2015 WL 5797019, at *3 (D. Conn. Sept. 30, 2015) (applying general contract law principles and federal precedent to the four-part *Phillips* framework).  Here, where Defendants have consistently relied on U.S. federal law, Defendants have waived their argument that English law applies. *NV Petrus SA v. LPG Trading Corp.*, 14-CV-3138, 2017 WL 1831096, at *5 (E.D.N.Y. May 4, 2017) (finding that defendants waived their argument that English law governs the dispute, because defendants "consistently relied on New York law in their memoranda of law"); *also see Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("[E]ven when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law.").

*Stanley* (not Alpari) and Defendants.  Defendants' argument simply cross-references a series of agreements that do not relate to this case to blur clear contractual relationships.  BNP Paribas again attempts to redraft Plaintiff's Complaint to their liking, merging Alpari's wholly-separated business lines.  All Defendants attempt to convert the fact that all parties to the case have engaged in business with Morgan Stanley – likely unbeknownst to each other – into an intimate and close relationship.  This relationship, no doubt, would come to the surprise of thousands of other businesses that may have contracted with Morgan Stanley.  Defendants' attempt to blur the lines and grant themselves sweeping rights precluded by the very contracts they cite must be rejected.  As discussed below, Defendants have failed to demonstrate a presumption of enforceability as to Alpari.

> **1.    The Alpari-BNP Pricing and Liquidity Agreement Relates to Transactions Not at Issue in This Action**

As previously discussed, Alpari's claims arise from its B-Book business and Alpari "does not advance claims based on its A-Book business."  BNP Am. Compl., ¶13.  Accordingly, the BNP Agreement is not at issue.  *See Malmsteen v. Universal Music Group Inc.*, No. 10 Civ. 3955(PAE), 2012 WL 2159281, at *5 (S.D.N.Y. June 14, 2012) ("For [a party to] to be bound [by a forum selection clause], (1) the Agreement whose breach he claims must arise under or be related to the Contract . . ."); *see also* BNP Am. Compl., ¶14 ("No written agreement between Alpari and BNP Paribas governed the matching and execution of transactions made by Alpari through Currenex with BNP Paribas.").  BNP attempts to evade this fact by simply rejecting the plain language of the Complaint, saying it nonetheless includes such trading, but it cites no authority allowing it to force Alpari to assert claims that it chooses not to assert.  Alpari "risks losing its chosen forum by enforcement of the forum-selection clause," and therefore, it is entitled to have the facts "viewed in the light most favorable to it, and no disputed fact should be

resolved against the party until it has had the opportunity to be heard." *Longo*, 1 F. Supp. 3d at 67 (quoting *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997)).

### 2. The Prime Brokerage Agreements Do Not Cover the Parties or the Claims at Issue

#### a. The Prime Brokerage Agreements Do Not Cover the Claims at Issue

Defendants assert that Alpari's "implied contract claims are covered by the broad language of the clause in the Alpari-MS ISDA and the Master Give-Up Agreements." Defendants' Memo at 28 (citing Januszewski Decl., Ex. 2 at Schedule, Part (h)(b) (alleging that the forum selection clause applies to "any suit, action or proceedings relating to any dispute, whether contractual or non-contractual, arising out of or in connection with this Agreement.")); Cohen Decl., Ex. 3, ¶¶1, 8(e); Januszewski Decl., Ex. 3, ¶¶1, 9(d) (noting the forum selection clauses apply to "any suit, action or other proceedings relating to this Give-Up Agreement"). But, Alpari and class members have specifically alleged implied contractual claims as to *rejected* transactions on Currenex that were not executed as they should have been. *See* Am. Compl., ¶14 ("No written agreement between Alpari and [Defendants] governed the matching and *execution* of transactions made by Alpari through Currenex with [Defendants]."). The Master Give-Up Agreements, in contrast, relate only to providing trading credit and the settlement of executed, non-rejected trades given up to Alpari's prime broker.

The Master Give-Up Agreements specifically limit the terms to "customers" to concern only the *settlement* of customers' executed trades. The Master Give-Up Agreements state "[w]ith respect to Customer Transactions, the authority set forth in Section 2(a) in respect of any particular Customer is *expressly limited* to a Net Daily Settlement Amount." Cohen Decl., Ex. 3, ¶3.; Januszewski Decl., Ex. 3, ¶3. Section 2(a) states the "Prime Broker has authorized each

party designated as a Customer in a Notice to enter into Customer Transactions on its behalf, with Dealer."  Cohen Decl., Ex. 3, ¶2(a).  Furthermore, the Net Daily Settlement amount is defined in the Give-Up agreement as relating specifically to "Customer Transactions *executed* by a Customer for any settlement date."  Cohen Decl., Ex. 3, ¶1.

Here, however, the claims asserted are not solely for executed trades.  Alpari is also asserting claims with respect to trades it attempted to make through Morgan Stanley that were *unexecuted* or *rejected* by the Dealer.  *See* Am. Compl., ¶55 ("[Defendant's] use of Last Look . . . result[ed] in [Defendant] reneging on otherwise matched and agreed trades.").  Alpari instead contends that Defendants breached their respective contractual duties when they reneged on matched and accepted customer trades.  *See* Credit Suisse and RBS Am. Compls., ¶¶99-100; BNPP Am. Compl., ¶¶101-02 ("Each time [Defendant] failed to honor Plaintiff's and Class members' matched trade orders by using Last Look, [Defendant] breached its contract with Plaintiff and Class members.").  There is nothing in the Prime Brokerage Agreements or Master Agreements that sets forth contractual obligations for any party as to rejected trade orders.

As non-parties to the Agreements, Defendants have not adequately demonstrated that the claims "arise out of or in connection with the" ISDA Agreement or "relat[e] to this [Give-Up] agreement."  *See* Januszewski Decl., Ex. 2 at Schedule, Part 13(b); Cohen Decl., Ex. 3, ¶¶1, 8(e); Januszewski Decl., Ex. 3, ¶¶1, 9(d).  As the Second Circuit held, the words "arise out of" do not mean "encompassing all claims that have *some possible* relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or 'arise in connection with' the contract." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 644 (1985)).  Additionally, the Second Circuit declined to ascribe "arising out of" to encompass "all disputes the resolution of which arguably

depend on the construction of an agreement." *Id*. (distinguishing its decision from that of the Seventh Circuit in *Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*, 28 F.3d 600 (7th Cir. 1994)).

Defendants rely upon *In re Libor-Based Financial Instruments Antitrust Litigation* to assert that when a forum selection clause exists in an ISDA agreement, it "extends to claims beyond breach of that contract to, for example, unjust enrichment or fraud claims, because such claims 'depend upon the existence of a contractual relationship between the parties.'" Defendants' Memo at 29 (quoting *Libor.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *28-29 (S.D.N.Y. Aug. 4, 2015)).   However, in *Libor*, the court explicitly precluded the interpretation Defendants now attempt to invoke, cautioning that the ISDA agreement's forum selection clause "does ***not*** mean that all claims ***against a counterparty*** may be brought in a contractually selected forum.  [Rather,] [t]he claim must ***relate to*** the particular ***contractual relationship***." *Libor*, 2015 WL 4634541, at *28-29; *see* Argument, *supra*, Section III.C(2)(a).  Here, of course, Defendants are not counterparties to the ISDA Agreement between Alpari and Morgan Stanley.  They are strangers to the ISDA Agreement.  Alpari alleges claims against Defendants would not "arise out of" the ISDA agreement.  *Id*.

Nor would Plaintiff's claims "relate to" the Give-Up Agreement.  Because Defendants are not parties to the Give-Up Agreement, it is not reasonable to conclude that their claims for unexecuted transactions with Defendants would "relate to" their agreement with Morgan Stanley. Defendants' liability is, admittedly, a result of their engaging in misconduct relating to foreign exchange transactions.  That does not, however, mean that it relates to any agreement Alpari reached that touches on the same financial market, including agreements with non-parties.

In sum, Defendants have not demonstrated that the forum selection clauses encompass claims for transactions that were never executed – the specific claims at issue – as opposed to

transactions that were executed and later given up to Alpari's prime broker.  Therefore, even if the parties were covered by the Prime Brokerage Agreements, which they are not, Defendants could not invoke these forum selection clauses.  *See Phillips*, 494 F.3d at 390 ("Specifically, we see no reason to presume the parties meant anything other than the dictionary definition of the term [arise out of]: to originate from a specified source.").

### b.    The Prime Brokerage Agreements Do Not Cover the Parties

Lacking agreements between Alpari and themselves that would impose a forum, Defendants instead attempt to rely on bilateral agreements between themselves and Morgan Stanley, and agreements between Alpari and Morgan Stanley, to contend that Alpari's claims must be heard in England.  These agreements, however, do not permit Defendants to enforce their provisions against Alpari.

Defendants are not a party to the Alpari-MS ISDA.  It is black-letter law that a party cannot use forum selection clauses found within this Agreement offensively against Alpari when they lack contractual privity.  *See Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) (A party "may not assert a cause of action [...] against a party with whom it is not in privity."); *see also Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 53, 63 (2d Cir. 1984) ("Absent a contractual relationship there can be no contractual remedy.").  Furthermore, neither Alpari nor the proposed class members are parties to the Master Give-Up Agreements that Defendants rely upon.  *Contrast E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract ***cannot bind*** a nonparty.") and *Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 130 (S.D.N.Y. 2015) ("a non-party to a contract cannot be bound by the contract") *with* Defendants' Memo at 27.

Moreover, the Alpari-MS ISDA and the Master Give-Up Agreements between Morgan Stanley-RBS and Morgan Stanley-Credit Suisse contain unambiguous language that mandates

that **only** parties to the individual, respective agreements are entitled to invoke the contractual provisions, including the forum selection clause.  *See* Januszewski Decl., Ex. 2 at Schedule, Part(h)(b)(ii) ("[A] person **who is not party to this agreement has no right** under the Contracts (Rights of Third Parties) Act 1999 **to enforce any term of this Agreement**.");[34] Cohen Decl., Ex. 3, ¶8(f); Januszewski Decl., Ex. 3, ¶8(g).  Thus, because "[u]nder the English Contracts (Rights of Third Parties) Act 1999, third parties may enforce contractual terms 'if the contract **expressly** provides' they may do so," there is no basis to permit RBS and Credit Suisse to exercise a forum selection clause found in an agreement between Morgan Stanley and Alpari to which they were not parties, or to bind Alpari to a forum selection clause found in agreements they made with Morgan Stanley to which Alpari was not a party.  *See Oei Hong Long v. Goldman Sachs Group, Inc.*, No. 13-CV-8655 (JMF), 2014 WL 2893310, at *5 (S.D.N.Y. June 25, 2014).[35]  Credit Suisse and RBS simply ignore this explicit language, attempting to exercise third party rights deriving from agreements that expressly preclude such an exercise of third party rights.

These provisions undercut the cases Defendants rely upon to assert a "close relationship" (Defendants' Memo at 27-28) because those cases do not address such an express denial of rights.  This express denial of a right here undercuts any argument that it was "foreseeable" that RBS and Credit Suisse would be permitted to invoke the forum selection clause in the Alpari-MS

---

[34]     The only exception to this is in the Alpari-MS ISDA stating that an "Affiliate may enforce the rights expressly granted to an Affiliate under this agreement."  Januszewski Decl., Ex. 2, Part 4, ¶(h)(b)(ii).  An "Affiliate" as defined by the ISDA means "in relation to any person, any entity **controlled**, directly or indirectly, by the person, any entity that **controls**, directly or indirectly, the person or entity directly or indirectly under common control with the person."  *Id*. ("[C]ontrol of any entity or person means ownership of a majority of the voting power of the entity or person.").  Neither Credit Suisse nor RBS "control, directly or indirectly," Morgan Stanley or Alpari, and thus, do not fall within the category of an "Affiliate" to be granted the right to enforce the Agreement.

[35]     *See also F5 Capital*, 2015 WL 5797019, at *6 (noting this "clause does not preclude non-parties, on any and all legal grounds, from asserting a right arising out of the Agreement.  It simply forecloses one particular legal basis upon which to assert such a right.").

ISDA or offensively enforce the forum selection clause in their respective Master Give-Up Agreements with Morgan Stanley against Alpari.

However, even if this express provision did not exist, Defendants' attempt to exercise the clause would still not be foreseeable. To determine whether a non-signatory's enforcement of a forum selection clause is "foreseeable to the signatory against whom the non-signatory wishes to enforce the forum selection clause," courts have looked to: whether or not the non-signatory is a wholly-owned entity by a signatory, a successor-in-interest of a signatory, "closely related" to a successor-in-interest of a signatory, or if rights of a non-signatory in a sub-agreement were wholly-derivative of rights acquired by a signatory.[36] In determining whether a party is "closely related," the Court considers the allegations of the complaints to determine the closeness of any relationship. *See F5 Capital*, 2015 WL 5797019, at *5 ("[C]ourts look to the allegations in the operative complaint, to assess the closeness of the parties' relationship.").

Here, the allegations disprove any privity-like relationship. The Complaint alleges, for instance, that "Alpari had a prime brokerage agreement with Morgan Stanley, but that agreement did not govern the specific matching and execution of transactions between Alpari and [Defendants]." Am. Compl., ¶14. Furthermore, "[n]o written agreement between Alpari and

---

[36]     *See F5 Capital*, 2015 WL 5797019, at *6 (finding that the third party, RBSSI, was a "wholly-owned" subsidiary of RBS [a signatory] and thus, it was foreseeable that RBSSI would invoke forum selection clause); *Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) (determining that if "successorship is established, a non-signatory is subject to the *M/S Bremen* presumption of the enforceability of mandatory forum selection clauses"); *Magi XXI Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (finding closeness of relationship between a non-signatory and a signatory because the sub-agreements entered into by the non-signatory were "wholly derivative" of the rights the signatory acquired through the other signatory"); *Malmsteen*, 2012 WL 2159281, at *5 ("For [a third-party] to be bound [by a forum selection clause], (1) the Agreement whose breach he claims must arise under or be related to the Contract; and (2) [the third party] must be either a successor-in-interest to [ ], the signatory, or 'closely related' to the actual successor-in-interest."); *Cuno Inc. v. Hayward Indus. Prods. Inc.*, No. 03-cv-03076 (MBM), 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005) ("Closely related" means if the non-party's "interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct.").

[Defendants] governed the matching and execution of transactions made by Alpari through Currenex with [Defendants]." *Id*.

These allegations are in stark contrast to the circumstances where courts have found a close relationship. Alpari is not a "wholly-owned" subsidiary of Morgan Stanley (for purposes of the Give-Up Agreements), nor are Defendants "wholly-owned" subsidiaries of Morgan Stanley or Alpari (for purposes of the Alpari-MS ISDA). *Contrast F5 Capital*, 2015 WL 5797019, at *6 (finding that the third party, RBSSL, was a "wholly-owned" subsidiary of RBS [a signatory] and thus, it was foreseeable that RBSSI would invoke the forum selection clause). Alpari is not a successor-in-interest to Morgan Stanley to be bound by the Give-Up Agreements between Morgan Stanley and Defendants. *Contrast Aguas*, 585 F.3d at 702 (determining that if "successorship is established, a non-signatory is subject to the *M/S Bremen* presumption of the enforceability of mandatory forum selection clauses"). Additionally, Alpari is not "closely related" to Morgan Stanley, or to a successor-in-interest to Morgan Stanley, nor are Defendants closely related to Alpari. *Contrast Cuno Inc.*, 2005 WL 1123877, at *6 ("Closely related" means if the non-party's "interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct."). In fact, a customer's interests are not "completely derivative of and directly related to" that of its prime broker, *id.*, since according to the U.S. Securities and Exchange Commission, "the customer [and] prime broker . . . are typically **distinct parties**," where the "prime broker's role is usually ministerial." *SFM Holdings, Ltd. v. Banc of America Securities, LLC*, 600 F.3d 1334, 1338-39 (11th Cir. 2010) (citing *Prime Broker Committee Request, SEC No-Action Letter*, 1994 WL 808441 (Jan. 25, 1994); *see also* Januszewski Decl., Ex. 2 at Schedule, Part 4(n) ("The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.").

29

Finally, the prime brokerage agreements did not stipulate that any sub-agreements to be made were "wholly derivative" of the rights Alpari acquired from Morgan Stanley's ISDA or of the rights Morgan Stanley acquired through the Give-Up Agreements.  *See Magi XXI*, 714 F.3d at 723.  In fact, no sub-agreements were mentioned in any of the prime brokerage agreements as being permitted.  Pursuant to the Alpari-MS ISDA, the relationship between Alpari and Defendants is not "sufficiently close that [defendants'] enforcement of the forum selection clause is foreseeable" to Alpari.  *See Magi XXI*, 714 F.3d at 723.  Thus, the Prime Brokerage Agreements do not cover the parties at issue.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Dated:  January 11, 2018                    Respectfully submitted,

                                             s/ Christopher M. Burke
                                            Christopher M. Burke (CB-3648)
                                            Walter W. Noss (WN-0529)
                                            Julie A. Kearns
                                            Kate Lv
                                            SCOTT+SCOTT, ATTORNEYS AT LAW,
                                            LLP
                                            707 Broadway, Suite 1000
                                            San Diego, CA 92101
                                            Telephone: (619) 233-4565
                                            Facsimile:  (619) 233-0508

                                            David R. Scott
                                            Kristen M. Anderson
                                            Peter A. Barile III (PB-3354)
                                            Sylvia Sokol
                                            Thomas K. Boardman
                                            SCOTT+SCOTT, ATTORNEYS AT LAW,
                                            LLP
                                            The Helmsley Building
                                            230 Park Avenue, 17th Floor
                                            New York, NY 10169
                                            Telephone: (212) 223-6444
                                            Facsimile:  (212) 223-6334

George A. Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Steven M. Berezney
Michael E. Klenov
Garrett R. Broshuis
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525

Michael D. Hausfeld
Reena A. Gambhir
Timothy S. Kearns
Jeannine Bayoumi
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
HAUSFELD, LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 s/ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

1