**EXHIBIT 1**

**DECLARATION OF JERMAINE C. HARMON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS THE AMENDED COMPLAINTS ON GROUNDS OF *FORUM NON CONVENIENS***

Pursuant to 28 U.S.C. §1746, I, Jermaine C. Harmon, declare:

1. I worked in various capacities (including as Chief Executive Officer and Global Head of Institutional Sales for Alpari's QuantumFX) for Alpari (US), LLC from 2010 through 2015.

2. Alpari was dissolved on September 18, 2015, and has brought the lawsuits relevant to this declaration as part of concluding its business affairs. As I was actively involved in Alpari's foreign exchange ("FX") business and have responsibility for winding up Alpari's affairs, I have personal knowledge of the facts set forth herein. If called upon and sworn as a witness, I could competently testify thereto.

3. From at least 2010 through 2015, Alpari acted as a FX broker and operated both "A-Book" and "B-Book" businesses in relation to electronic FX transactions.

4. No later than 2010, and through at least 2013, Alpari operated a "B-Book" business. In that role, Alpari did not pass the orders it received from its clients onto a liquidity provider. Instead, Alpari kept "B-Book" orders in house and acted as a liquidity provider for its B-Book clients by taking the other side of its clients' orders. Alpari managed the risks associated with its "B-Book" trading by, as necessary, executing its own, independent FX trades through Currenex with liquidity providers, including Credit Suisse AG, The Royal Bank of Scotland plc (a wholly-owned subsidiary of The Royal Bank of Scotland Group plc), and BNP Paribas.

5. From 2011-2015, Alpari also operated an "A-Book" business, where it acted as an intermediary by passing on its clients' trade orders to liquidity providers. Alpari operated

QuantumFX (for which I served as Global Head of Institutional Sales for over 2 years) for its institutional clients as part of its "A-Book" business. Once an "A-Book" client entered into a trade with Alpari, Alpari would simultaneously enter into an offsetting transaction in its own name with a liquidity provider for the exact same currency pair and volume. Therefore,  Alpari did not hold funds or bear risks for its "A-Book" clients. Instead, Alpari profited from a set markup on each A-Book transaction for its institutional clients independent of the price paid by those clients.

6.   In 2011, Alpari entered into separate Agreements for the Provision of Pricing and Liquidity ("Pricing and Liquidity Agreements") and Platform Agreements with Credit Suisse AG, The Royal Bank of Scotland plc, and BNP Paribas that provided for them to stream executable pricing to Alpari's A-Book trading platform, QuantumFX. These contracts had no relation to Alpari's B-Book Business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on January 11, 2018:

_____
Jermaine C. Harmon