UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>                 Plaintiff,<br><br>     -against-<br><br>BNP PARIBAS, S.A.<br><br>               Defendant. | No. 17 Civ. 05278 (LGS) |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>                 Plaintiff,<br><br>     -against-<br><br>CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; and CREDIT SUISSE SECURITIES (USA), LLC,<br><br>               Defendants. | No. 17 Civ. 05282 (LGS) |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated,<br><br>                 Plaintiff,<br><br>     - against -<br><br>ROYAL BANK OF SCOTLAND GROUP PLC and RBS SECURITIES, INC.,<br><br>               Defendants. | No. 17 Civ. 05284 (LGS) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS THE AMENDED COMPLAINTS ON GROUNDS OF *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT……………………………………………………………1

I. ALPARI'S CLAIMS ARE SUBJECT TO MANDATORY NFA ARBITRATION.................2

    A.    BNPP's NFA Arbitration Rights Are Not Limited to Claims That Arose After the Date of Membership .....................................................................2

    B.    NFA Arbitration Rights Are Not Extinguished by Suing Multiple Entities Within Each Bank .......................................................................................3

II. ALPARI SEPARATELY AGREED TO ARBITRATE ITS CLAIMS AGAINST CREDIT SUISSE AND RBS...........................................................................................8

    A.    Alpari Agreed to Arbitrate Claims Against Credit Suisse and RBS by Entering into the Pricing and Liquidity Agreements ..................................8

III. ALPARI'S CLAIMS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*........10

    A.    Alpari's Claims Against BNPP Are Subject to Dismissal For *Forum Non Conveniens* Based on the P&L Agreements ..........................................10

    B.    Alpari's Claims Against Credit Suisse and RBS Are Subject to Dismissal For *Forum Non Conveniens* Based on the Prime Brokerage Agreements.............11

CONCLUSION.....................................................................................................15

# TABLE OF AUTHORITIES

C̲A̲S̲E̲S̲

P̲A̲G̲E̲(̲S̲)̲

*In re A2P SMS Antitr. Litig.*,
   972 F. Supp. 2d 465 (S.D.N.Y. 2013)..............................................................5, 7

*Benihana of Tokyo, L.L.C. v. Benihana Inc.*,
   73 F. Supp. 3d 238 (S.D.N.Y. 2014).......................................................................9

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003)....................................................................................3

*Brown v. Web.com Grp., Inc.*,
   57 F. Supp. 3d 345 (S.D.N.Y. 2014).....................................................................13

*Cuno, Inc. v. Hayward Indus. Prods., Inc.*,
   No. 03 Civ. 3076 (MBM), 2005 WL 1123877 (S.D.N.Y. May 10, 2005) .............12

*In re Currency Conversion Fee Antitr. Litig.*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003).........................................................5-6, 6, 9

*Denney v. Jenkens & Gilchrist*,
   340 F. Supp. 2d 348 (S.D.N.Y. 2004).....................................................................9

*Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*,
   No. 99 CIV. 10550 (SHS), 2000 WL 1277597 (S.D.N.Y. Sept. 7, 2000)..............14

*F5 Capital v. RBS Sec., Inc.*,
   No. 3:14-cv-1469 (VLB), 2015 WL 5797019 (D. Conn. Sept. 30, 2015),
   *aff'd*, 692 F. App'x 66 (2d Cir. 2017)............................................................14, 15

*Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*,
   No. 98 Civ. 7181 (WHP), 1999 WL 637236 (S.D.N.Y. Aug. 20, 1999)..................6

*In re Foreign Exch. Benchmark Rates Antitr. Litig.*,
   No. 13 Civ. 7789 (LGS), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) .................6

*Forgione v. Gaglio*,
   No. 13 Civ. 9061 (KPF), 2015 WL 718270 (S.D.N.Y. Feb. 13, 2015) ..................10

*Greenberg v. Ameriprise Fin. Servs., Inc.*,
   No. 15CV3589ADSAYS, 2016 WL 3526025 (E.D.N.Y. Mar. 31, 2016) .................6

PAGE(S)

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
    387 F.3d 163 (2d Cir. 2004)............................................................................4, 6, 9

*Longo v. FlightSafety Int'l, Inc.*,
    1 F. Supp. 3d 63 (E.D.N.Y. 2014) ...........................................................................11

*Magi XXI, Inc. v. Stato della Città del Vaticano*,
    714 F.3d 714 (2d Cir. 2013)...................................................................................13

*Midamines SPRL Ltd. v. KBC Bank NV*,
    No. 12 CIV. 8089 RJS, 2014 WL 1116875 (S.D.N.Y. Mar. 18, 2014),
    *aff'd*, 601 F. App'x 43 (2d Cir. 2015)....................................................................13

*Oei Hong Leong v. Goldman Sachs Grp., Inc.*,
    No. 13-CV-8655 (JMF), 2014 WL 2893310 (S.D.N.Y. June 25, 2014) ...............15

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*,
    No. 12 CIV. 5651 AJN, 2014 WL 1172581 (S.D.N.Y. Mar. 21, 2014)...................5

*Overseas Ventures, LLC v. Row Mgmt., Ltd.*,
    No. 12 Civ. 1033 (PAE), 2012 WL 5363782 (S.D.N.Y. Oct. 26, 2012) ................14

*Phillips v. Audio Active, Ltd.*,
    494 F.3d 378 (2d Cir. 2007)........................................................................12, 13, 15

*Ragone v. Atl. Video at Manhattan Ctr.*,
    No. 07 Civ. 6084 (JGK), 2008 WL 4058480 (S.D.N.Y. Aug. 27, 2008),
    *aff'd*, 595 F.3d 115 (2d Cir. 2010) .........................................................................7

*Ragone v. Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010).................................................................................4-5

*Shaw Grp., Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003)....................................................................................2

*Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*,
    198 F.3d 88 (2d Cir. 1999).................................................................................5, 7

*UBS Fin. Servs. Inc. v. W. Virginia Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011)....................................................................................2

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)...................................................................10

*Wong v. HSBC USA, Inc.*,
    No. 10 Civ. 0096 (WHP), 2010 WL 3154976 (S.D.N.Y. Aug. 9, 2010)...............15

P<small>AGE</small>(S)

S<small>TATUTES</small> & R<small>ULES</small>

7 U.S.C. § 6k ...................................................................................................7

9 U.S.C. § 1 et *seq*...........................................................................................15

17 C.F.R. § 1.3(aa)...........................................................................................8


O<small>THER</small> A<small>UTHORITIES</small>

*BASIC Details: The Royal Bank of Scotland plc*, NFA,
    https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Gt26uPc3RPI%3d&rn=Y (last
    visited Jan. 25, 2018) ...............................................................................7

Contracts (Rights of Third Parties) Act 1999 .....................................14, 15

Fed. Reserve Bank of N.Y., Foreign Exchange Prime Brokerage: Product Overview and Best
    Practice Recommendations, at 36-38 (2005), *available at*
    https://www.newyorkfed.org/medialibrary/microsites/fxc/files/
    annualreports/ar2005/fxar05PB.pdf.........................................................12

NFA Arbitration Rules § 1(c) ........................................................................7

NFA Member Arbitration Rules § 1(j) ...........................................................2

NFA Registration Rules § 101(d) ...............................................................7, 8

*Notice I-99-11: Expansion of NFA's Member Arbitration Program*, NFA,
    https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=183 .........................4

UK Financial Conduct Authority, Financial Services Register: Alpari UK Ltd.,
    https://register.fca.org.uk/(last visited Jan. 25, 2018) ...........................10

USPTO, Trademark Electronic Search System: Quantum FX,
    http://tmsearch.uspto.gov/ (last visited Jan. 25, 2018) .........................10

Defendants BNP Paribas ("BNPP"); Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC (together, "Credit Suisse"); and The Royal Bank of Scotland Group plc and RBS Securities Inc. (together, "RBS") respectfully submit this joint reply memorandum of law in support of their motion to compel arbitration or, in the alternative, to dismiss the Amended Complaints on the ground of *forum non conveniens*.

## PRELIMINARY STATEMENT

Plaintiff Alpari (US) LLC ("Alpari") admits, as it must, that claims between and among NFA Members are subject to mandatory arbitration.  Pl.'s Mem. 12.  Moreover, there is no dispute that all Defendants are either NFA Members or parent companies of the NFA Member Defendants against whom Alpari makes no distinct allegations, instead alleging in conclusory fashion that they engaged "collectively" in the FX transactions at issue.  Alpari's claims are therefore subject to mandatory arbitration.

Alpari's transparent attempts to evade NFA arbitration are unavailing.  There is no support in the NFA Rules for the proposition that arbitration rights are extinguished simply because Alpari decided to include NFA Members' parent companies as Defendants in this action. Moreover, the claims between these entities are "intertwined," such that Alpari is estopped from denying its obligation to arbitrate the dispute against these Defendants.  And with respect to BNPP, whose parent entities were not named as defendants, there is no support in the NFA Rules for limiting its arbitration rights based on the date it became a Member.  In short, the NFA Rules, as well as case law in this Court and the Second Circuit rejecting similar attempts to avoid arbitration, mandate that all of Alpari's claims be arbitrated.

Even if the NFA Rules did not mandate arbitration, which they do, Alpari would be required by written agreements to arbitrate or pursue this matter in the courts of England. Alpari's arguments as to why these agreements do not apply are equally unconvincing.

1

**ARGUMENT**

**I.**

**ALPARI'S CLAIMS ARE SUBJECT TO MANDATORY NFA ARBITRATION**

**A.**     **BNPP's NFA Arbitration Rights Are Not Limited to Claims That Arose After the Date of Membership**

BNPP's entitlement to arbitration is undisputed.  Pl.'s Mem. 2.  BNPP is an NFA Member, and Alpari was an NFA Member at the time of the disputed transactions.  Alpari's attempt to limit the concededly arbitrable claims to the period after May 7, 2013 is based on changing the word "or" to "and" in the NFA Rules.

The Rules define "Member" as "a Member of NFA other than a contract market *or* a person that was a Member (other than a contract market) at the time the acts or transactions that are the subject of the dispute occurred."[1]  The phrase "at the time the acts or transactions that are the subject of the dispute occurred" applies only where the person in question (such as Alpari) is not currently a Member but *was* a Member during the relevant period.  Accordingly, under the plain language of the NFA Rules, BNPP is subject to mandatory arbitration because it is currently an NFA Member, and Alpari is subject to mandatory arbitration because it was an NFA Member at the time the disputed transactions occurred.  Crediting Alpari's suggestion otherwise would violate the requirement to interpret contracts and arbitration provisions according to their plain meaning.  *See, e.g., UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648-49 (2d Cir. 2011) (requiring interpretation of FINRA's arbitration provisions according to their plain meaning); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (requiring words in contracts and arbitration provisions to be given their plain meaning).  The

---

[1] NFA Member Arbitration Rules, Section 1(j) (2007), https://www.nfa.futures.org/rulebook/rules.aspx?Section=6 (emphasis added); see also Pl.'s Mem. 13-14 ("[A] 'Member' is someone who either is a Member or 'was a Member . . . .'").

plain meaning of "Member" under the NFA Rules covers both BNPP and Alpari for the full claims period.[2]

B.    **NFA Arbitration Rights Are Not Extinguished by Suing Multiple Entities Within Each Bank**

Alpari's opposition with respect to Defendants Credit Suisse and RBS rests on the proposition, without any basis in the NFA Rules, that a dispute is not "between and among Members" if the plaintiff adds the NFA Member's parent company as a defendant and alleges in conclusory fashion that the NFA Member and the parent acted "collectively." If accepted, such a position would gut the NFA's mandatory arbitration provision, rendering it voidable at the claimant's option. There are several reasons why that anomalous result should not be permitted.

First, the NFA Rules provide that "disputes between and among Members shall be arbitrated under these Rules." They do not provide that the dispute must be "solely" between Members or that a Member's arbitration rights are forfeited when the claimant chooses to add another Member's parent company to the case. Such a strained reading would be inconsistent with the plain language of the rule and well-established principles favoring arbitration. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003) (noting that a self-regulatory organization's arbitration provisions should "be interpreted to give effect to the parties' intent as expressed by the plain language of the provision. . . . [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (citations and internal quotation marks omitted)). That is particularly true here, where Alpari lumped the respective NFA Members and parent companies together as single entities ("Credit Suisse" and "RBS") that

---

[2] Should the Court decline to compel arbitration of all claims between BNPP and Alpari, BNPP respectfully requests that the claims arising between May 7, 2013 and May 23, 2017 be sent to arbitration, as Alpari has conceded is appropriate. Pl.'s Mem. 2.

"collectively" engaged in the conduct alleged in its Amended Complaints, with no distinct allegations against the parent entities.  Credit Suisse Am. Compl. ¶ 15; RBS Am. Compl. ¶ 15.

Grasping at straws, Alpari looks to an "NFA Notice" to suggest that an arbitrable dispute must be "solely" between Members, but this news announcement lacks any binding effect.[3] Moreover, when the selectively quoted phrase in the announcement is read in context, its purpose is to call attention to the *expansion* of the NFA Member arbitration program to a "mandatory arbitration program for disputes between Members," as compared to the elective arbitration regime for Associates.[4]  The announcement does not and cannot change the plain language of the Rule, which simply provides that the dispute must be between or among Members, which the claims in these cases plainly are.  A reading that would render the mandatory arbitration regime voidable at the discretion of the claimant would be inconsistent with the Rule *and* the Notice.

Second, under well-established principles of estoppel, Alpari cannot use a shell game of corporate entities to avoid arbitration.  The Second Circuit has held that where a plaintiff asserts "intertwined" claims against multiple parties (some bound by the arbitration provision, others not), it is estopped from denying an obligation to arbitrate the entire dispute against all defendants in a single proceeding.  *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177–78 (2d Cir. 2004).  In addition to this "factual intertwinement" between the dispute and the agreement to arbitrate, "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with [the signatory party] should be estopped from denying an obligation to arbitrate a similar dispute with the [nonsignatory party]."  *Ragone*

---

[3] Pl.'s Mem. 12 & n.22 (quoting *Notice I-99-11: Expansion of NFA's Member Arbitration Program ("NFA Notice to Members")*, NFA, https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=183 (July 15, 1999)).  This Notice I-99-11 can be found in the NFA website's archive of "Notices to Members," which are described as "messages or reminders regarding compliance updates, NFA events, and other important news."  *Notices to Members*, NFA, https://www.nfa.futures.org/news/newsNoticeList.asp (last visited Jan. 25, 2018).

[4] *NFA Notice to Members*.

*v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (internal citations and quotation marks omitted).

It is difficult to imagine a more compelling fact pattern for estoppel than that involved in this case. Alpari's Amended Complaints treat the NFA Members and parent companies as a single unit, defining them together as "RBS" and "Credit Suisse," respectively, and alleging that they "collectively" "engaged in FX transactions with Plaintiff and the Class that are the subject matter of this lawsuit," RBS Am. Compl. ¶ 15; Credit Suisse Am. Compl. ¶ 15. Accordingly, the subject matter of the dispute between Alpari and the NFA Member Defendants and the parent corporation Defendants is not only "intertwined," it is exactly the same. *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97-98 (2d Cir. 1999) (estopping a signatory from avoiding arbitration because, in a related lawsuit, it treated the defendants' companies, both signatories and non-signatories, as if they were "interchangeable" and a "single unit"); *see also In re A2P SMS Antitr. Litig.*, 972 F. Supp. 2d 465, 478 (S.D.N.Y. 2013) (finding that "the subject matter of the arbitrable dispute between the signatories is factually intertwined with the dispute between the signatory and the non-signatory and 'is, in fact, the same dispute'" (citation omitted)); *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12 CIV. 5651 AJN, 2014 WL 1172581, at *5 (S.D.N.Y. Mar. 21, 2014) (finding estoppel appropriate where plaintiff alleged identical claims against defendants without making any distinction between them throughout his complaint).

Moreover, the corporate relationship between NFA Members RBSSI and Credit Suisse Securities (USA) LLC and their parent entities—which Alpari treats as indivisible units in the Amended Complaint—is more than sufficient to preclude Alpari from evading arbitration of its claims in their entirety. *See In re Currency Conversion Fee Antitr. Litig.*, 265 F. Supp. 2d 385,

403 (S.D.N.Y. 2003) (finding that because the non-signatory was "the parent corporation of its wholly-owned subsidiary," the signatory, "[t]his more than satisfies the 'close relationship' factor" (internal citation omitted)); *see also Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 CIV. 7181 (WHP), 1999 WL 637236, at *6 (S.D.N.Y. Aug. 20, 1999) (finding sufficiently close relationship where non-signatory owned fifty percent of the signatory).[5]

Third, application of estoppel, which is amply supported by the above-described intertwinement, is further bolstered by Alpari's gratuitous inclusion of parent companies as defendants in this case.  Credit Suisse Group AG and RBS Group are bank holding companies. Neither are engaged in the business of FX trading.  Gougherty Decl. ¶ 4; Kläy Decl. ¶ 3. Contractual FX claims against these entities are based wholly on the conduct of their subsidiaries and only derivative, but nothing remotely resembling a veil-piercing or alter ego claim is pled.[6] *See In re Currency Conversion Fee*, 265 F. Supp. 2d at 402–03; *JLM Indus.*, 387 F.3d at 178; *cf. Greenberg v. Ameriprise Fin. Servs., Inc.*, No. 15-CV3589 (ADS) (AYS), 2016 WL 3526025, at *7 (E.D.N.Y. Mar. 31, 2016) (compelling FINRA arbitration of claims against defendant that were "entirely derivative" of claims against the FINRA-registered defendants, and where the plaintiff did "not treat the [d]efendants differently in his complaint or in his legal arguments in opposition to the [d]efendants' present motion").

Tellingly, with respect to RBS, Alpari asserts claims against RBS Group (the bank holding company) but inexplicably does not assert any claims against The Royal Bank of Scotland plc ("RBS plc"), an NFA Member that is the RBS entity that serves as a foreign exchange dealer in the United States (through defendant RBSSI, which acts as RBS plc's agent

---

[5] *See* Gougherty Decl. ¶¶ 5, 8; *see also* Defs.' Mem. 4 & n.12.

[6] Moreover, the actions against RBS Group, Credit Suisse AG, and Credit Suisse Group AG are beyond the scope of personal jurisdiction, *see In re Foreign Exch. Benchmark Rates Antitr. Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 1268267, at *3-4, *7 (S.D.N.Y. Mar. 31, 2016).  Defendants therefore reserve any additional bases for dismissal. *See* Defs.' Mem. 1, n.3.

for that purpose).[7]   Gougherty Decl. ¶ 7.   Thus, Alpari's claims as to RBS are based wholly on the conduct of NFA Members.   A party is estopped from avoiding an arbitration agreement by failing to name the relevant entity to its dispute and instead "su[es] a 'related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration.   Such a maneuver should not be allowed to succeed.'"   *Smith/Enron*, 198 F.3d at 98 (citation omitted).

Fourth, it would be inefficient for this litigation to proceed against certain defendants while arbitration proceeds in parallel against other defendants with respect to identical claims. *See Ragone v. Atl. Video at Manhattan Ctr.*, No. 07 CIV. 6084 (JGK), 2008 WL 4058480, at *10 (S.D.N.Y. Aug. 29, 2008) (granting motion to compel arbitration where "the events underlying the plaintiff's claims against both defendants are so intertwined that it would be inefficient and unfair for the same witnesses to appear both in an arbitration proceeding, and then again in a separate litigation relating to the same matters in dispute"), *aff'd*, 595 F.3d 115 (2d Cir. 2010).[8]

Finally, Alpari's argument that NFA principals, such as RBS Group, Credit Suisse Group AG, and Credit Suisse AG, are, by definition, "Associates" and therefore subject to arbitration at the claimant's option is baseless.   An NFA Associate is an "Associated Person" or "AP" "as that term is used in the [Commodity Exchange] Act ["CEA"] and the regulations thereunder who is required to be registered as such under the Act."[9]   The CEA and the regulations thereunder, in turn, define an "Associated person" as "any *natural person* who is associated" with certain

---

[7] *See BASIC Details: Royal Bank of Scotland plc The, NFA,* https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Gt26uPc3RPI%3d&rn=Y (last visited Jan. 25, 2018).

[8] Should the Court decline to compel arbitration of these actions in their entirety, Defendants respectfully request that the Court exercise its discretion and stay the balance of the proceedings pending resolution of the arbitration.   *In re A2P*, 972 F. Supp. 2d at 499-500 (discussing that a stay is appropriate where it will not otherwise hamper the proceedings or impose undue hardship on the non-moving party).

[9] NFA Registration Rules, Rule 101(d) (2017), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8&RuleID=RULE%20101; NFA Member Arbitration Rules, Section 1(c), https://www.nfa.futures.org/rulebook/rules.aspx?Section=6 (defining "Associate" with reference to "associated person" as used in 7 U.S.C. § 6k).

entities (such as futures commission merchants) in the limited capacity of soliciting or accepting

customers' orders or supervising any such person.  17 C.F.R. § 1.3(aa) (emphasis added).  As

entities and not natural persons, RBS Group, Credit Suisse Group AG, and Credit Suisse AG are

not and cannot be Associated Persons and thus are not NFA Associates.  Instead, they are

"principals," based on their ownership interest in NFA Members.[10]

## II.

## ALPARI SEPARATELY AGREED TO ARBITRATE ITS CLAIMS AGAINST CREDIT SUISSE AND RBS

### A.    Alpari Agreed to Arbitrate Claims Against Credit Suisse and RBS by Entering into the Pricing and Liquidity Agreements

Alpari admits that it entered into the pricing and liquidity agreements with Credit Suisse

and with RBS ("P&L Agreements"), and that these agreements contain arbitration clauses.  Pl.'s

Mem. 15-16.  Therefore, the Court need only resolve the threshold inquiry of whether the scope

of the arbitration clause in the P&L Agreements encompasses Alpari's claims.  Defs.' Mem. 10;

Pl.'s Mem. 10.  Because Alpari's claims fall within the scope of the P&L Agreements'

arbitration clause, the Court should compel arbitration even if the Court finds that the NFA

Member Arbitration Rules do not apply.

To determine whether a dispute falls within the scope of an arbitration clause, the Court

must first decide whether the clause is broad or narrow.  Alpari does not dispute that the

arbitration clause here, which is sweepingly drafted to allow either party to submit to arbitration

"any suit, action, or proceeding . . . relating to this Agreement," is broad.[11]  When an arbitration

---

[10] NFA Registration Rules, Rule 101(t) (2017),
https://www.nfa.futures.org/rulebook/rules.aspx?Section=8&RuleID=RULE%20101 (defining principal).

[11] Rather, Alpari incorrectly argues that the scope of the clause is irrelevant.  Pl.'s Mem. 16.  Alpari attempts to
avoid the associated presumption of arbitrability by blurring the distinction between the threshold arbitration
inquiries.  Based on the proposition that the dispute falls outside the arbitration clause's scope, Alpari incoherently
concludes that no valid arbitration clause exists.  Pl.'s Mem. 16.  If the breadth of an arbitration clause were
irrelevant to whether a dispute falls within the clause's scope, the "roadmap" established by the Second Circuit and

clause is broad, a "presumption of arbitrability" arises, which "can be overcome only if it may be said with 'positive assurance' that the arbitration clause is not susceptible to the interpretation that it brings plaintiffs' claims within its sweep." *In re Currency Conversion Fee*, 265 F. Supp. 2d at 406 (citation omitted); *see also* Defs.' Mem. 13.  Plaintiff has failed to meet this high bar.

Alpari's repeated contentions that it asserts only claims arising from trades as part of its B-Book business are irrelevant.  Plaintiff's proffered distinction between its "A-Book" and "B-Book" businesses bears on differences in its relationships with clients and its internal book keeping, not on differences in its relationship with Defendants.  As detailed in Defendants' opening brief, both Alpari's claims and the P&L Agreements focus on the terms of Defendants' provision of liquidity for Alpari's eFX trading operations over an ECN.  Defs.' Mem. 13-16.[12] Thus the claims fall within the scope of the P&L Agreements' arbitration clause.[13]

Moreover, Alpari's A-Book claims remain in the scope of its class definition, even after its significant amendments to its Complaints.  Alpari asserts that because QuantumFX was Alpari's platform and it is not a "third party ECN" under the class definition, Alpari's A-Book therefore is excluded from the class definition.  Pl.'s Mem. 19.  This does not follow.  First, Alpari has consistently referred to "third party ECNs" to mean trading platforms operated by a party other than the liquidity provider.  Credit Suisse Am. Compl. ¶¶ 3-4, 91; RBS Am. Compl.

---

[12] While certain provisions relate to Alpari's A-Book business, Alpari fails to cite any provisions within the P&L Agreements limiting their application to only the A-Book business.  Pl.'s Mem. 16.

[13] The case law Alpari cites proves the point that its claims are indeed in scope of the arbitration clauses, as the facts in these cases bear no resemblance to those of the present case.  In *Denney*, for example, plaintiffs brought claims relating to advice regarding plaintiffs' investment in a new currency trading venture designed as a tax shelter.  340 F. Supp. 2d at 349-50.  The agreements containing arbitration clauses, however, related to consulting services in connection with Plaintiffs' planned sales or expansions of their existing roofing, equipment, and other business operations.  *Id.* at 352-53.  There is no such disconnect here.  Alpari agreed to arbitrate issues relating to Credit Suisse's and RBS's actions as liquidity providers for FX transactions and Alpari's claims arise from and relate to the transactions with Credit Suisse and RBS as FX liquidity providers.  The allegations underlying the claims touch matters covered by the P&L Agreements, and any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration.  *JLM Indus.*, 387 F.3d at 171.

related case law would be meaningless.  *Benihana of Tokyo v. Benihana Inc.*, 73 F. Supp. 3d 238, 251-52 (S.D.N.Y. 2014); s*ee also Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 348, 351-52 (S.D.N.Y. 2004).

¶¶ 3-4, 91; BNPP Am. Compl. ¶¶ 3-4, 93.  Defendants accordingly proceeded under that definition in their motion to compel.  Defs.' Mem. 5-6 (distinguishing Currenex as a third party ECN, unlike Defendants' proprietary trading platforms).  Plaintiff effectively seeks for the first time to re-define "third party ECN" to mean a trading platform operated by a third party relative to the liquidity provider and trading counterparty.  Even if this were the appropriate way to define a "third party ECN," QuantumFX is in fact a third party platform.  Publicly available government records, of which this Court can properly take judicial notice,[14] demonstrate QuantumFX is a brand name of Alpari UK Ltd.[15]  Alpari UK Ltd. is not a party to this action and therefore its platforms are third party ECNs to all entities in this action.  Moreover, QuantumFX is also a third party platform relative to the so-called "A-Book traders" and Defendants.

## III.

## ALPARI'S CLAIMS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*

### A.    Alpari's Claims Against BNPP Are Subject to Dismissal For *Forum Non Conveniens* Based on the P&L Agreements

If the Court reaches the question of the applicability of the BNPP P&L Agreement, which it need not, Alpari's attack on the forum selection clause is unavailing.  Alpari's contention that it asserts only claims arising from trades as part of its B-Book business is as unsuccessful against the forum selection clause in the BNPP P&L Agreement as it is against the arbitration provisions in the Credit Suisse and RBS P&L Agreements.  *See supra* at Section II.A.

---

[14] *See, e.g.*, *Wells Fargo Bank, NA. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("Courts routinely take judicial notice of [] governmental records" that have been "retrieved from official government websites."); *Forgione v. Gaglio*, No. 13 CIV. 9061 (KPF), 2015 WL 718270, at *17 (S.D.N.Y. Feb. 13, 2015) .

[15] USPTO, Trademark Electronic Search System: Quantum FX, *available at* http://tmsearch.uspto.gov/ (Search term: Quantum FX) (identifying Alpari (UK) Limited Company as the holder of the "Quantum FX" trademark); UK Financial Conduct Authority, Financial Services Register: Alpari UK Ltd., *available at* https://register.fca.org.uk/ (Search term: Alpari UK) (Financial Conduct Authority registration record for Alpari UK Ltd., listing "Quantum FX" and "QuantumFX" as two of the firm's trading/brand names).

The BNPP P&L Agreement relates to BNPP's services as a liquidity provider.  Hall Decl. Ex. 1. §2.1.2.  While certain provisions relate to Alpari's A-Book business, nothing in the agreement limits its application to solely that business line.  The forum selection clause states that "this Agreement and any non-contractual obligations arising out of or in connection with it shall" be governed by English law and litigated in English courts.  Under both U.S. and English law, this clause must be read broadly, and a presumption of enforceability applies.[16]  Defs.' Mem. 22-23.  Alpari's lawsuit relates to trades subject to this forum selection clause, and this Court should dismiss it on the basis of *forum non conveniens*.[17]

**B.     Alpari's Claims Against Credit Suisse and RBS Are Subject to Dismissal For *Forum Non Conveniens* Based on the Prime Brokerage Agreements[18]**

In a bid to escape the English forum selection provisions contained in the prime brokerage agreements among Alpari, Defendants Credit Cuisse and RBS, and Morgan Stanley, Alpari asks this Court to find that the complementary prime brokerage agreements are no different from those of the "thousands of other businesses that may have contracted with Morgan Stanley."  Pl.'s Mem. 22.  Such an argument is belied by the facts.  The prime brokerage and "Give-Up" arrangements with Morgan Stanley, which Alpari acknowledges in its Amended Complaints ¶ 14, are fundamental to the FX trading that is the core of Alpari's claim.  Alpari should not be able to reap the benefits afforded by this tripartite arrangement, yet avoid the obligations set forth in the agreements to litigate any disputes in English courts.

---

[16] Contrary to Alpari's assertion, Defendants have not waived their argument that English law applies.  *See* Pl.'s Mem. 21 n.33.  Defendants explicitly provided notice that they intended to raise issues of English law, *see* Defs.' Mem. 2 n.5, and then cited to and applied English cases, which Defendants submitted as Appendices to their brief.

[17] Alpari cannot save its argument by citing to cases in which no forum selection clause was at issue.  *See* Pl.'s Mem. 20.  As the court in *Longo* stated, "there is generally a strong presumption in favor of upholding the enforceability of forum-selection clauses."  *Longo v. FlightSafety Int'l, Inc.*, 1 F. Supp. 3d 63, 67 (E.D.N.Y. 2014) (enforcing English forum selection clause).

[18] BNPP does not join in this argument and notes that the applicability of any contractual forum selection clause should be resolved by the NFA arbitrator.  *See* Defs.' Mem., Argument, Section I.B.

First, Alpari's assertion that the prime brokerage agreements are irrelevant because they only relate to executed trades is simply incorrect. Absent the prime brokerage arrangement, Alpari would have been unable to *access* pricing and liquidity from RBS and Credit Suisse, regardless of whether any trades resulted.[19] Also, Alpari's claims are not limited to rejected transactions. Alpari also brings claims relating to executed trades "filled . . . at worse prices." Am. Compls. ¶ 5; *see also* BNPP Am. Compl, ¶ 89; Credit Suisse Am. Compl. ¶91; RBS Am. Compl. ¶ 89 (defining the class to include persons whose orders were "filled at a price less favorable than the original . . . price to which it was matched"); Pl.'s Mem. 24 ("Here, however, the claims asserted are not solely for executed trades."). Alpari does not deny that such trading is subject to the Prime Brokerage Agreements.

The claims at issue here depend entirely on the existence of the parties' prime brokerage relationship. Accordingly, they are plainly "in connection with" and "relating to" the Master Give-Up and Alpari-MS ISDA agreements,[20] which extend to a "broad[] category of disputes" beyond pure breach of contract. *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389-90 (2d Cir. 2007); *see also Cuno, Inc. v. Hayward Indus. Prod., Inc.*, No. 03 CIV. 3076 (MBM), 2005 WL 1123877, at *5 (S.D.N.Y. May 10, 2005) (describing a forum selection clause which extended to disputes "arising under or relating to the Agreement" as "written broadly," and finding that "claims beyond those alleging breaches of the contract that contains the clause are covered").

---

[19] *See* Fed. Reserve Bank of N.Y., Foreign Exchange Prime Brokerage: Product Overview and Best Practice Recommendations, at 36-38 (2005), *available at* https://www.newyorkfed.org/medialibrary/microsites/fxc/files/ annualreports/ar2005/fxar05PB.pdf ("Prime brokerage allows these market participants, despite their limited credit history or higher risk profile, to use the prime broker's (presumably) higher credit rating to gain access to new counter-parties.").

[20] *See* Januszewski Decl. Ex. 2 at Schedule, Part(h)(b) (forum selection clause applies to "any suit, action or proceedings *relating to* any dispute, whether contractual or non-contractual, arising out of *or in connection with this Agreement*" (emphasis added)); Cohen Decl. Ex. 3 ¶¶ 1, 8(e); Januszewski Decl. Ex. 3 ¶¶ 1, 9(d) (forum selection clauses apply to "any suit, action or other proceedings *relating to this [Give-Up] Agreement*" (emphasis added)).

Alpari's attempt to limit the scope of the clauses narrowly to claims that "arise out of" the prime brokerage agreements must be rejected.  The "Second Circuit [has] distinguished forum selection clauses that govern claims that 'arise out of' an agreement from claims that 'have some possible relationship with the contract,' including claims that 'relate to,' are 'associated with,' or 'arise in connection with' the contract."  *Brown v. Web.com Grp., Inc.*, 57 F. Supp. 3d 345, 361 (S.D.N.Y. 2014) (quoting *Phillips*, 494 F.3d at 389).  Here, Alpari's claims relate to and are connected with the prime brokerage agreements, without which Alpari would not have access to pricing and liquidity from RBS and Credit Suisse.

Second, courts have explicitly rejected as "meritless" Alpari's argument that a forum selection clause cannot be enforced against a plaintiff "because there is no contractual agreement or privity between Plaintiffs and [Defendants]."  *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12 CIV. 8089 (RJS), 2014 WL 1116875, at *5 (S.D.N.Y. Mar. 18, 2014) (quotation marks omitted), *aff'd*, 601 F. App'x 43 (2d Cir. 2015).  Instead, "[i]t is well-established that forum-selection clauses are enforceable not only against signatories but also against non-signatories that are either successors-in-interest or 'closely related' to a signatory."  *Id.* (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 722–23 (2d Cir. 2013)).

Although Alpari points out circumstances where courts have found a signatory and non-signatory to be closely related, *see* Pl.'s Mem. 28-30, these decisions indicate conditions that are sufficient—but not necessary—to such a finding.  Alpari also fails to distinguish cases holding that a foreseeable beneficiary to agreements may enforce a forum selection clause against a signatory, even though the beneficiary is not a signatory to the agreement itself.  *See* Defs.' Mem. 26-28.  Foreseeability does not depend on actual knowledge, but on whether the party resisting enforcement had "reason to know" that others may become "bound up" in a dispute

13

which hinges on the rights and duties set forth in the agreement.  *See Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 CIV. 10550 (SHS), 2000 WL 1277597, at *4 (S.D.N.Y. Sept. 7, 2000); *F5 Capital v. RBS Sec. Inc.*, No. 3:14-CV-1469 (VLB), 2015 WL 5797019, at *6 (D. Conn. Sept. 30, 2015), ("[A]ctual knowledge . . . at the time [the parties] entered into the [a]greement . . . says nothing about whether [the non-signatory's] role was foreseeable . . . ."), *aff'd*, 692 F. App'x 66 (2d Cir. 2017).[21]

Alpari, as a beneficiary to the arrangement between its prime broker and these Defendants, could reasonably foresee that they would seek to enforce the forum selection clauses contained in the Master Give-Up Agreements and Alpari-MS ISDA against it.  Moreover, the documents indicate on their face that Alpari was copied to the Give-Up Notice between RBS and MS, and Credit Suisse and MS, which identified Alpari as a Designated Party of the prime brokerage arrangement and specifically pointed Alpari to the Master FX Give-Up Agreements in the first paragraph.  *See* Cohen Decl. Ex. 5; Januszewski Decl. Ex. 4.[22]

This close relation among signatories and non-signatories is not affected by the provisions in the Master Give-Up Agreements and Alpari-MS ISDA stating that one "who is not party to this agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement."  Januszewski Decl. Ex. 2 at Schedule, Part (h)(b)(ii);

---

[21] In *Direct Mail*, the court found that an entity related to the defendant, MBNA, and an unrelated defendant, Harte-Hanks Data Technologies, Inc., could also enforce the forum selection clause for English jurisdiction against the plaintiff, even though they were not parties to the agreement containing the clause.  2000 WL 1277597, at *5.  The court found that the plaintiff had reason to know from the agreement's provisions, which referred to other MBNA companies, that the agreement involved pecuniary benefit to other companies.  *Id.* at *4.  Although defendant Harte-Hanks was not an MBNA company, the court applied these principles equally to it, because, among other reasons, the claims against all defendants were "integrally related."  *Id.* at *5; *see also Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc.*, No. 12 CIV. 1033 (PAE), 2012 WL 5363782, at *6 (S.D.N.Y. Oct. 26, 2012) (enforcing forum selection clause against a sales representative, who was a non-signatory to a sales agreement, in part because of his roles in the transaction and his compensation provided under the agreement).

[22] While Alpari states "Alpari was not a party to any of these Master FX Give-Up agreements between Morgan Stanley and Defendants, and there is no indication that the agreements were ever sent to Alpari," Alpari stops short of asserting that it was not on notice of the clauses providing for English jurisdiction.  *See* Pl.'s Mem. 9-10.

Cohen Decl. Ex. 3 ¶ 8(f); Januszewski Decl. Ex. 3 ¶ 9(g).  Defendants here do not seek to assert a "right under the [Act]."[23]  Each of RBS and Credit Suisse here "instead grounds its right in the well-established federal common law doctrine allowing 'closely related' entities to assert such rights against other signatories."  *F5 Capital*, 2015 WL 5797019, at *6 (finding that a non-signatory could enforce a forum selection clause against the signatory plaintiff—despite the agreement's disclaimer of rights under the same Act—because "the clause does not preclude non-parties, on any and all legal grounds, from asserting a right arising out of the Agreement.  It simply forecloses one particular legal basis upon which to assert such a right." (citation omitted)); *see also Wong v. HSBC USA, Inc.*, No. 08-13555 (JMP), 2010 WL 3154976, at *7 (S.D.N.Y. Aug. 9, 2010) (finding that "while the trust deeds deprive Plaintiffs of rights derived from the Contracts Act of 1999, Plaintiffs may hold rights outside of the Act").

Because these clauses are reasonably communicated, mandatory, and cover the parties and claims at issue, they are presumptively enforceable.  *Phillips*, 494 F.3d at 383-84.[24]  As a result, Alpari's claims must be litigated in England pursuant to the forum selection clauses.

## CONCLUSION

For the reasons discussed herein, Defendants respectfully submit that the Court should grant their motion to compel arbitration pursuant to Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, or, alternatively, dismiss the case pursuant to the doctrine of *forum non conveniens*.

---

[23] The Act is an English statute that provides certain rights to third parties, including the right to "stand in the shoes of the signatory and compel arbitration of any substantive right covered by an arbitration clause."  *Oei Hong Leong v. Goldman Sachs Grp., Inc.*, No. 13-CV-8655 (JMF), 2014 WL 2893310, at *5 (S.D.N.Y. June 25, 2014) (citing the Contracts (Rights of Third Parties) Act, 1999, ch. 31, § 8(1))).

[24] Alpari has not rebutted this presumption because its opposition fails to argue that "enforcement would be unreasonable or unjust" or that the clauses should be invalidated "for such reasons as fraud or overreaching." *Phillips*, 494 F.3d at 383-84 (citation and internal quotation marks omitted).

Dated:   New York, New York
         January 26, 2018


ALLEN & OVERY LLP                              CAHILL GORDON & REINDEL LLP

____/s/ Laura R. Hall_____                  ____/s/ David G. Januszewski____
David C. Esseks                                David G. Januszewski
Laura R. Hall                                  Herbert S. Washer
Rebecca Delfiner                               Elai Katz
1221 Avenue of the Americas                    Jason M. Hall
New York, NY 10020                             Sheila C. Ramesh
Telephone: 212-610-6300                        80 Pine Street
david.esseks@allenovery.com                    New York, NY 10005-1702
laura.hall@allenovery.com                      Telephone: 212-701-3000
rebecca.delfiner@allenovery.com                djanuszewski@cahill.com
                                               jhall@cahill.com
*Counsel for Defendant BNP Paribas*
                                               *Counsel for Defendants Credit Suisse
                                               Group AG; Credit Suisse AG; and
                                               Credit Suisse Securities (USA) LLC*


DAVIS POLK & WARDWELL LLP

____/s/ Joel M. Cohen_____
Joel M. Cohen
Melissa C. King
Jennifer A. Prevete
450 Lexington Avenue
New York, NY 10017
Telephone: 212-450-4000
joel.cohen@davispolk.com
melissa.king@davispolk.com
jennifer.prevete@davispolk.com

*Counsel for Defendants The Royal Bank of
Scotland Group plc and RBS Securities Inc.*